**Jesse NIPPER, et al., Plaintiffs,**

v.

**Lawton CHILES, Governor of Florida, et al., Defendants.**

**No. 90–447–Civ–J–16.**

United States District Court, M.D. Florida, Jacksonville Division.

June 2, 1992.

Denise Marcel Prescod, Jacksonville, Fla., Mitchell F. Dolin, Anthony Herman, Jeffrey S. Harleston, Covington & Burling, Washington, D.C., Brenda Wright, Lawyers' Committee for Civil Rights Under Law, Robert B. McDuff, Gillis W. Long Poverty Law Center, New Orleans, La., for plaintiffs.

Mitchell Dean Franks, Special Counsel, Akerman, Senterfitt, George Lee Waas, Attorney General's Office, Dept. Of Legal Affairs, Tallahassee, Fla., for Bob Martinez.

Denis Allen Dean, Mitchell Dean Franks, Special Counsel, Akerman, Senterfitt, George Lee Waas, Attorney General's Office, Dept. Of Legal Affairs, Tallahassee, Fla., for Jim Smith, Dot Joyce and Lawton Chiles.

Leonard S. Magid, General Counsel's Office, City of Jacksonville, Jacksonville, Fla., for Tommie R. Bell.

Robert A. Butterworth, Atty. Gen., Frank E. Brown, Asst. Atty. Gen., Tallahassee, Fla., for defendants.

## ORDER

JOHN H. MOORE, II, District Judge.

### I. Procedural background

This cause is before the Court on the post-trial briefs submitted by the parties. The individual Plaintiffs in this action are certain black residents and registered voters of Duval County, Florida. Plaintiff D.W. Perkins Bar Association is an unincorporated association of black attorneys in Duval County, Florida; most of these attorneys are residents of and registered voters in Duval County and the Fourth Judicial Circuit. Defendants are the Governor, the Secretary of State, and the Director of the Florida Division of Elections, all sued in their official capacities only.

Plaintiffs seek injunctive and declaratory relief against the method of at-large circuitwide and countywide voting for judges of the Fourth Judicial Circuit and the Duval County Court. Plaintiffs allege that the current at-large system of election unlawfully dilutes the voting strength of black citizens and denies them an equal opportunity to participate in the political process and elect candidates of their choice, in violation of section two of the Voting Rights Act, 42 U.S.C. § 1973. Plaintiffs also allege that the maintenance of the at-large election system violates the Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Based on the entire record, the Court makes the following findings of fact and conclusions of law.

### II. Overview of Legal Standards

Section 2(a) of the Voting Rights Act prohibits states and their political subdivisions from imposing any voting qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgement of the right to vote of any citizen on account of race or color. Section 2(b) provides that:

a violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

The United States Supreme Court had occasion to interpret section two in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The *Gingles* Court set forth the following factors, taken from the Senate Report accompanying the 1982 amendment to the Act, which are to be considered in evaluating a section two claim:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of a minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction;

8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

9. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* 478 U.S. at 36–37, 44–45, 106 S.Ct. at 2759–60, 2763 (quoting S.Rep. No. 97–417, 97th Cong.2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07) (hereinafter "S.Rep."). According to the *Gingles* Court, the most important factors to be considered are racial bloc voting and minority electoral success. *Id.* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. This list of factors is not exhaustive; other relevant factors may also be considered. *Id.* 478 U.S. at 45, 106 S.Ct. at 2763. According to the Senate Report, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or another." S.Rep. at 29, 1982 U.S.C.C.A.N. at p. 207. These factors should be considered under a "functional" view of the political process, with a "searching practical evaluation of the past and present reality." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2764.

The *Gingles* Court identified three circumstances which must be present to make out a claim of vote dilution. *Id.* 478 U.S. at 48, 106 S.Ct. at 2765. First, the minority group must demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. *Id.* 478 U.S. at 50, 106 S.Ct. at 2766. Second, the minority group must show that it is politically cohesive. *Id.* 478 U.S. at 51, 106 S.Ct. at 2766. Finally, the minority group must demonstrate that the white majority votes sufficiently as a block to enable it usually to defeat the minority's preferred candidate, in the absence of special circumstances such as incumbency and lack of opposition. *Id.* 478 U.S. at 51, 106 S.Ct. at 2766–67. The Court stressed that these three factors are "necessary preconditions" to a successful claim of vote dilution by an at-large scheme. *Id.* 478 U.S. at 50, 106 S.Ct. at 2766.

The Eleventh Circuit Court of Appeals has been unable to agree on the precise meaning of *Gingles.* In *Solomon v. Liberty County,* 899 F.2d 1012 (11th Cir.1990), a case which presented an opportunity to interpret the proper scope of *Gingles,* the Eleventh Circuit split evenly in an *en banc* decision. Judge Kravitch, writing for five judges, wrote that a plaintiff can prove vote dilution simply by showing the ability to elect a black candidate from a single member district and racial bloc voting that operates usually to defeat the black candidate in an at-large system. *See Solomon,* 899 F.2d at 1017. Judge Kravitch only considered the remaining factors set forth in the Senate Report and cited and relied upon by the *Gingles* Court to the extent that those factors shed light on the threshold factors. *See id.* at 1019; *but cf. Gingles,* 478 U.S. at 80, 106 S.Ct. at 2781 (approving the district court's discussion of the "totality of the circumstances," including Senate Report factors such as past discrimination in voting, and campaign appeals to racial prejudice).

Judge Tjoflat, writing for five judges, interpreted *Gingles* to require the following. First, if a plaintiff cannot prove the existence of a large and compact minority group, and racial bloc voting that usually works to defeat the minority group's preferred candidate, then the plaintiff cannot make out a claim of section two vote dilution. *See Solomon,* 899 F.2d at 1035. Second, if the plaintiff does prove the above factors, defendant may rebut the plaintiff's case by offering proof of other objective factors that, under the totality of the circumstances, indicate that the voting community is not driven by racial bias. *Id.* The ultimate issue to be decided is " 'whether the political processes were equally open' " under the totality of the

circumstances. *Id.* at 1036 (quoting S.Rep. at 35, 1982 U.S.C.C.A.N. at p. 213).[1]

Recently, the Supreme Court held that section two applies to the election of trial judges. *See Houston Lawyers' Assoc. v. Attorney General,* — U.S. —, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991). The Court further held that a state's interest in maintaining the link between a trial judge's jurisdiction and the area of residency of his or her voters is a legitimate factor to be considered by courts in determining whether a section two violation has occurred under the totality of the circumstances. *See id.* 111 S.Ct. at 2381; *see also* S.Rep. at 28–29 (stating that the tenuousness of the state policy behind the electoral system under challenge is a factor to be considered under the totality of the circumstances). The Supreme Court had no occasion in *Houston Lawyers* or its companion case, *Chisom v. Roemer,* — U.S. —, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), to explain or refine the standard that should be applied in section two litigation. *See Chisom,* 111 S.Ct. at 2368. However, the Supreme Court's recognition of a state's interest as a legitimate factor to be considered reaffirms the notion that a vote dilution claim ultimately must be evaluated under the totality of the circumstances.

### III. Findings of Fact

#### Background

The Fourth Judicial Circuit is located in northeast Florida and consists of Duval, Clay, and Nassau Counties. The circuit covers approximately 2,017 square miles, while Duval County covers approximately 776 square miles. According to the 1990 census, the total population of the Fourth Judicial Circuit is 822,898, and the black population is 173,937, approximately 21% of the total. In Duval County, the total population is 672,971, and the black population is 163,902, approximately 24.4% of the total.

The Fourth Judicial Circuit has twenty-eight circuit judges. The Duval County Court has twelve judges. Circuit judges serve six-year terms, and county judges serve four-year terms. Appointees to mid-term vacancies to circuit and county judgeships initially serve a shorter term which varies depending upon the date of the appointment and the next general election. The circuit and county courts are trial courts, with the circuit courts having general jurisdiction of civil and criminal cases and the county court having limited jurisdiction. Each circuit judge has jurisdiction or authority within the entire circuit. Similarly, each judge of the Duval County Court has jurisdiction or authority within the entire county.

The next regularly scheduled elections for circuit judges in the Fourth Circuit and county judges in Duval County are in September of 1992. The judges on these courts are elected at-large in circuitwide or countywide non-partisan elections. There is no residency requirement other than residency within the circuit or county. A majority vote requirement applies to judicial elections, so that if the leading candidate fails to garner a majority in the primary, he or she must participate in a runoff against the next highest vote-getter in the general election. Candidates must run for designated seats on the court, and must pay a candidate qualifying fee of five and one-half percent of the annual salary of the office. *See* Fla.Stat. § 105.031 (Supp.1992). This qualifying fee amounts to approximately $5,000 for circuit court positions and approximately $4,400 for county court positions based on current salaries. A petition process also exists whereby a candidate may avoid paying the qualifying fee by obtaining a sufficient number of signatures from qualified persons. *See* Fla.Stat. § 105.035. Candidates for circuit and county judge run in a non-partisan primary.

1. The Eleventh Circuit remains divided on the proper interpretation of *Gingles,* and specifically on the issues of whether plaintiffs can make out a section two violation simply by establishing the *Gingles* factors and whether defendants can raise a defense under the totality of the circumstances after the plaintiffs have satisfied the *Gingles* preconditions. *See Hall v. Holder,* 955 F.2d 1563, 1568 n. 9 (11th Cir.1992).

## A. Ability to draw a majority black subdistrict

Plaintiffs allege that a subdistrict containing a black voting age population majority can be created within the Fourth Judicial Circuit and Duval County. Plaintiffs' expert demographer, Jerry Wilson, has drawn a subdistrict that is 60.09% black in voting age population and that Plaintiffs allege could be used to elect six of the twenty-eight judges in a circuit court subdistricting plan, and three of the twelve judges in a county court subdistricting plan. Defendants did not present testimony by a demographer concerning the ability to draw a black majority subdistrict.

## B. Racially Polarized Voting

To establish racial polarization in circuit and county judicial elections, both sides offered expert testimony and statistical evidence. Plaintiffs offered the testimony of Dr. Allan Lichtman, Professor of History at the American University, Washington, D.C. Dr. Lichtman studied the six circuit and county judicial elections in which black candidates have competed against white candidates since 1972. Dr. Lichtman did not analyze any circuit or county judicial elections in which only white candidates were involved.

Dr. Lichtman also chose to analyze numerous elections for offices not at issue in this litigation ("exogenous" elections) as a means of demonstrating racial polarization in the judicial elections at issue. An election bearing strong similarities to the at-issue elections was Joseph Hatchett's 1976 election to the Florida Supreme Court. Lichtman also included partisan elections such as Jesse Jackson's presidential primaries in 1984 and 1988, Alcee Hastings's various runs for statewide office, and elections for city council and civil service board. All of the non-judicial elections analyzed by Lichtman involved black candidates in competition against white candidates. Almost all of these exogenous elections were of a partisan nature.

Defendants relied on two expert witnesses, Dr. Ronald Weber, Professor of Government at the University of Wisconsin, and Dr. Joan Haworth, former Professor of Economics at Florida State University and currently President of Economic Research Services, Inc. Drs. Weber and Haworth analyzed many of the same elections as Dr. Lichtman, and also examined a substantial number of elections not analyzed by Dr. Lichtman.

Dr. Weber, like Dr. Lichtman, analyzed elections for circuit and county judge between 1972 and 1990. However, whereas Lichtman only considered judicial elections where a black candidate ran for office against one or more white candidates, Weber also considered elections for circuit and county judge in which only white candidates participated. With regard to non-judicial exogenous elections, Weber argued that only those non-judicial elections for low visibility offices similar to judgeships would be of importance in a judicial elections case. Weber questioned Lichtman's reliance on high visibility elections for statewide or national office, such as the presidential primaries participated in by Jesse Jackson in 1984 and 1988.

These experts used the same or similar statistical techniques to analyze the electoral results at issue. Drs. Lichtman, Weber, and Haworth used ecological regression analysis and extreme case analysis to study the voting behavior of the circuit and county electorates. Ecological regression analysis permits estimation of the voting behavior of racial groups through comparison of the racial composition of the population at each precinct to the division of the vote among competing candidates at each precinct. The regression analysis uses data from all of the precincts participating in an election, and produces estimates of the voting behavior of both whites and blacks.[2] Extreme case analysis looks at

2. The experts also calculated two supplemental analyses so as to determine the reliability of the estimates derived from the ecological regression analysis. The "r²" value, which can range from 0 to 1.0, indicates with a value close to 1.0 that the percentage of the vote cast for the black candidate can be nearly perfectly predicted from the racial composition of a particular political unit. The "statistical significance" value serves a similar purpose—suffice it to say that,

voting results in precincts that are 90% or more black in voter registration and compares them with the results in precincts that are 90% or more white in voter registration to see if there are differences in the level of support given to candidates of different races in those precincts.

Between 1972 and 1990 there were six contested elections for circuit and county court judgeships in which black candidates ran, involving candidacies for five seats.[3] The elections and black candidates, respectively, were: (1) 1972 Primary, Circuit Court, Leander Shaw; (2) 1972 Runoff, Circuit Court, Leander Shaw; (3) 1978 Primary, Circuit Court, Harrell Buggs; (4) 1978 Primary, Duval County Court, Alfred Washington; (5) 1984 Primary, Duval County Court, Denise Prescod; (6) 1984 Primary, Duval County Court, Dietra Micks. Thus, only two of these elections occurred within six years of the filing of the instant suit, while the remaining four elections are well over a decade old. According to the ecological regression studies,[4] the majority of black voters supported the black candidate in each of these six elections, while the majority of white voters always opted for the white candidate, resulting in the defeat of all the black candidates except for Leander Shaw's win in the 1972 primary. In the six elections, black support for the black candidate ranged from 73% to 98%, white support for the black candidate ranged from 3% to 33%, black support for the white candidate ranged from 2% to 27%, and white support for the white candidate ranged from 67% to 97%.[5] The extreme case analysis shows very similar results in the Shaw, Buggs,

Washington, Prescod, and Micks judicial elections.[6]

The Court has also considered results from judicial elections not involving black candidates[7] during the same 1972–1990 period. During this period, there were a total of nineteen contested elections for circuit judge. The two Shaw elections analyzed above and the Buggs election are included in the total of nineteen. The black candidate of choice won 68% of the contested circuit court elections (thirteen of nineteen elections). Also, during 1972–1990 there were twenty-four contested elections for Duval County Court judge. The Micks, Prescod, and Washington elections are included in the total of twenty-four. The black candidate of choice won 58% of the contested county court elections (fourteen of twenty-four elections). For Dr. Weber's complete statistical analysis of the 1972–1990 circuit and county court elections not involving black candidates, which the Court adopts as findings of fact for statistical purposes only, see Defendants' exhibit 22.

With regard to elections other than for circuit and county judge, the 1976 Florida Supreme Court election involving Joseph Hatchett has the most relevance to the issues in this case. The Hatchett race was a statewide judicial election in which Hatchett ran against a white candidate. Dr. Lichtman's regression estimates, which the Court adopts as findings of fact on this point, show that a majority of white voters in the circuit and in Duval County supported Hatchett's reelection, coupled with virtually unanimous support from black

---

in this case, there is little if any disagreement among the experts on the high reliability of the regression estimates for the relevant elections.

**3.** In one of the circuit court elections a black candidate, Leander Shaw, ran in the primary and also advanced to the runoff.

**4.** With respect to these six elections, the Court adopts Dr. Lichtman's statistical estimates as findings of fact. Dr. Haworth's estimates for the same elections are nearly identical, and equally as credible.

**5.** For complete regression estimates on these elections, see Appendix A.

**6.** For complete results of the extreme case analysis, see Appendix B.

**7.** The term "black candidate" can be misleading, since it can refer to a candidate who is black or to *a candidate who is preferred by a majority of* black voters. In this opinion, the term "black candidate" will mean a candidate who is black, whereas the term "black candidate of choice" will refer to a candidate who is preferred by the majority of black voters regardless of the candidate's race.

voters.[8]

The expert witnesses also analyzed a number of non-judicial exogenous elections. For regression analysis of Jesse Jackson's 1984 and 1988 presidential primary elections; Shirley Chisholm's 1972 presidential primary election; Alcee Hasting's 1970 U.S. Senate primary election, 1990 Secretary of State primary election, and 1990 Secretary of State runoff election; see Tables 3 and 5 of Dr. Lichtman's report, which the Court adopts as findings of fact. For regression analysis of thirty-four elections including contests for City Council At-large, Civil Services Board, State Representative, Supervisor of Elections, Mayor, and a constitutional amendment, see Dr. Haworth's report at Appendix C and Appendix H, which the Court also adopts as findings of fact. For the reasons set forth in the Conclusions of Law, the Court has accorded little weight to these non-judicial, exogenous elections.

### C. Electoral Structure

Judicial elections in the Fourth Judicial Circuit and Duval County are at-large elections, accompanied by a majority vote requirement, a numbered-place system, and the use of staggered terms.

### D. History of discrimination in Florida and its current effects on black participation in the political process

Florida has a history of discrimination against black citizens with respect to the franchise. The devices employed by Florida to disfranchise or discriminate against black citizens included: (1) the expungement of black voters from the voting lists in the 1880s; (2) a poll tax, enacted in 1889; (3) a multiple ballot statute, enacted in 1889; (4) the direct primary (also known as the "white primary"), adopted in 1901, whereby blacks were excluded from participating in nominating the Democratic Party candidate; and, (5) a requirement that of-

ficeholders post bonds, adopted in 1885. These laws applied to all elections, including judicial elections.

None of these discriminatory devices are currently in effect in Florida. The poll tax, a facially neutral requirement that applied to all voters, was abolished by the State of Florida in 1939. The multiple ballot requirement was abolished in the 1940s. The direct primary was struck down by the Florida Supreme Court in 1945. The bond posting requirement, which applied to all candidates and had its origins in England, was removed by the 1968 Florida Constitution.

In addition, Florida has a history of discrimination and segregation in other areas. Transportation facilities were segregated until the 1950s. Florida's public schools and facilities were segregated for many years. However, none of the three counties within the Fourth Judicial Circuit have ever been subject to the preclearance provisions of section five of the Voting Rights Act.

Until 1958, Florida refused to permit black citizens to attend the University of Florida College of Law. The law school at Florida A & M, which was created in 1951 as a law school for black students, was not accredited until several years later. Florida A & M's law school was abolished in 1967, one year after the creation of the Florida State University College of Law.

Plaintiffs also introduced a report issued in 1990 by the Florida Supreme Court Racial and Ethnic Bias Study Commission. This Report documented numerous features of Florida's justice system that allegedly have an adverse effect on the dispensation of justice to minority citizens, including the underrepresentation of minorities in the judiciary in comparison to the percentage of minorities in the total population. See generally Report and Recommendations of the Florida Supreme Court Racial

---

**8.** Dr. Lichtman's report accords the Hatchett election no greater relevance than the 1984 and 1988 presidential primaries involving Jesse Jackson. See Table 3, Plaintiffs' ex. 2, pp. 18–19. The Court rejects this analytical approach.

Equating Hatchett's non-partisan, lower profile, judicial election with Rev. Jackson's partisan, high profile, presidential election for the purpose of showing racial polarization in circuit and county judicial elections is misleading.

and Ethnic Bias Study Commission (Dec. 11, 1990).

### E. Socio-economic effects of discrimination

Statistical evidence presented in this case indicates that black citizens in Florida still suffer in some ways from the effects of Florida's history of purposeful discrimination. Blacks in the Fourth Judicial Circuit have lower median incomes than whites, and blacks are more likely to have incomes below the poverty level than whites. Blacks have lower rates of high school and college graduation than whites, and are more likely to be unemployed. Blacks also are more likely than whites to live in households without access to a car or telephone, and have lower rates of home ownership and lower home values than whites. Thus, blacks in Florida and the Fourth Circuit are not as well off economically as whites.

Statistics on black and white political participation in Florida and the Fourth Judicial Circuit show little disparity. Specifically, black voting age population is 19.1% of the total voting age population of the Fourth Judicial Circuit. The number of black registered voters is 19.9% of the total number of registered voters in the circuit. Similarly, black voting age population is 21.9% of the total voting age population of Duval County. The number of black registered voters is 22.7% of the total number of registered voters in the county. Thus, blacks of voting age are registered at higher rates than whites of voting age in both the Fourth Judicial Circuit and Duval County.

Two other statistical measures of black political participation are relevant. First, black voter turnout generally appears to be comparable to white voter turnout in judicial elections, although at slightly lower levels.[9] In any event, no comprehensive evidence of black and white voter turnout for elections in the Fourth Judicial Circuit or Duval County was submitted to the Court. Second, the "rolloff" effect—the number of voters who sign-in at the polls but fail to cast a vote for an election—is greater among black voters than for white voters.

### F. Candidate Slating Process

There is no evidence that a candidate slating process has been used to prevent black candidates from seeking circuit or county judgeships. The opportunity to seek judicial office is equally open to all qualified persons.

### G. Use of Racial Appeals in Campaigns

Plaintiffs concede that there is no evidence that white candidates for judicial offices have used racially-biased appeals to exclude black candidates from circuit or county judgeships. More specifically, there is no evidence that racial appeals were used in any of the circuit or county judicial elections analyzed by the parties.

### H. Extent of electoral success

At the time of trial there was one black judge among the twenty-eight circuit court judges and two black judges among the twelve county court judges.[10] Thus, 7.5% of the forty circuit and county judges are black. Judge Henry Adams on the circuit court attained office by virtue of appointment to a vacancy, and has not been opposed for his subsequent election. The same is true with county court Judge Alfred Washington. The second black county court judge, James Ruth, was appointed within the last year and has never stood for re-election.

---

**9.** Regression estimates from Dr. Lichtman and Dr. Haworth indicated that in the six judicial elections in which a black candidate participated, black voter turnout varied from fourteen percent to twenty-four percent, while white voter turnout varied from eighteen percent to twenty-seven percent. No other evidence of voter turnout in other elections was submitted to the Court.

**10.** Since the time of trial, Henry E. Davis, who is black, was appointed as a Circuit Judge. Judge Davis's appointment means that ten percent of the current circuit and county judiciary is black. The Davis appointment has played no part in the Court's consideration of this case.

The evidence of black electoral success is mixed. The black circuit and county judges who have faced reelection have been unopposed and, of course, successful in their reelection bids. In a similar judicial election, Joseph Hatchett's 1976 Supreme Court election, the incumbent Hatchett defeated a white candidate. Hatchett garnered a majority of the white vote in both the Fourth Judicial Circuit and Duval County. No black candidate has won a contested election for circuit or county judge at least since 1972. Of course, there have been no contested elections for circuit or county judge involving black candidates, other than the Shaw, Buggs, Washington, Prescod, and Micks elections.

A review of non-judicial elections shows similar mixed results. Black candidates have had modest success in county elections. Earl Johnson won a city council at-large seat in 1967, and was reelected in 1971, 1975, and 1979.[11] However, no black candidate has won a contested circuitwide or countywide election for any office since 1979. With the exception of Earl Johnson, many successful black candidates were incumbents by virtue of appointment. Harold Gibson and Gwendolyn Leapheart were incumbents by virtue of appointment when they won elections in 1975 and 1979, respectively, for the Civil Service Board in Duval County.[12]

### I. Responsiveness

Witnesses called by both parties agreed that the current circuit and county judges are fair and impartial in the dispensation of justice.

### J. State Interests in Maintaining the Current System

#### a. Eligibility requirements

Under the Florida Constitution, a candidate for circuit judge must have been a member in good standing of the Florida Bar for at least five years prior to his or her obtaining judicial office. Fla. Const. art. V, § 8. Candidates for Duval County Judge must meet the same criteria.

These requirements, the legality of which have not been challenged in this case, substantially limit the eligible pool of qualified judicial candidates. To illustrate this point, Dr. Haworth analyzed three categories of attorneys in the Florida Bar. First, Dr. Haworth calculated the number of black attorneys as a percent of the total attorneys of the Florida Bar located in the Fourth Judicial Circuit and Duval County. Second, Dr. Haworth analyzed the percentage of black attorneys eligible to be circuit or county judges. Finally, Dr. Haworth analyzed the percentage of attorneys with years of experience in the Florida Bar similar to those possessed by the incumbent judges when they were first selected (this group was termed the "likely pool" of candidates). Dr. Haworth's report, which the Court adopts as findings of fact on this point, demonstrates that black attorneys constitute only four percent of the total pool of attorneys in the circuit, three percent of the eligible attorneys in the circuit, and two and one-half percent of the likely pool of attorneys in the circuit. Virtually identical percentages exist for black attorneys in Duval County as well.

#### b. Maintaining circuit-wide scheme for single-member offices

Several state interests have been asserted in support of the current at-large system. Defendants assert that the state has a valid interest in allowing each citizen within the jurisdiction which the judge serves to have the right to vote on each judge who might hear his or her case. Defendants assert that maintaining a link between a trial judge's jurisdiction and elective base serves to foster judicial independence while maintaining judicial accountability. Defendants also contend that a system of single-member districts or sub-

---

**11.** In 1967, the Jacksonville City Council was created with fourteen council members elected in single member districts and five elected at-large county-wide.

**12.** In addition, a black candidate defeated a white candidate in a Republican primary election for city council at-large in 1990, only to lose in the general election to another white candidate.

districts would place added pressure on elected judges to respond to their specific electoral constituents when one of their constituents is involved in litigation against a nonresident of that subdistrict. It is also argued that subdistricts (and any system based on cumulative or limited voting) would generate more ideological, less impartial, judges.

### K. Special circumstances

Several special circumstances are highly relevant to the issues in this case, and are discussed below. These are: (1) the role of incumbency; (2) the appointment process and its role in judicial selection and election; and, (3) special factors present in the judicial elections under challenge in which black candidates participated.

#### i. Incumbency

Only one of the twenty-eight current incumbent circuit judges has faced electoral opposition after his initial appointment or election.[13] None of the twelve current incumbent county judges has faced electoral opposition after his initial appointment or election. In judicial elections, incumbency and name recognition are the primary factors behind electoral success.

#### ii. The appointment process

Florida law requires the Governor to fill vacancies in the circuit and county courts by appointment. Fla. Const. art. V, sec. 11(b & d). The Governor must appoint one of at least three nominees submitted to him by the Fourth Judicial Circuit Nominating Commission (hereinafter "Commission"). *Id.* The Commission consists of nine members. Three members are appointed by the Board of Governors of the Florida Bar and must be attorneys in good standing of the Florida Bar. *Id.* sec. 20(5). Three members are appointed by the Governor and may or may not be attorneys. *Id.* These six appointed members must then select three additional members who may not be members of the Florida Bar. *Id.* Mem-

bers of the Commission must reside or practice law within the territory of the Fourth Judicial Circuit. *Id.* Currently, three of the nine Commission members are minorities; in general, two of the nine Commission members for the past decade have been minorities.

Of the twenty-eight current circuit judges, seventeen were originally appointed to the circuit court.[14] Similarly, five of the twelve current county judges were originally appointed to the county court. The power of incumbency makes the appointment process especially relevant, since incumbent judges are rarely challenged. The appointment process is the primary vehicle by which judges on the circuit and county courts initially obtain office.

In addition, the appointment process is equally open to qualified minority and non-minority attorneys. Statistics provided by the Commission indicate that from 1987 to 1991, the Commission accepted applications for eleven circuit and county court vacancies. Of the total number of applicants, approximately eleven percent were black attorneys. An almost identical percentage of blacks were among the total number of nominees sent by the Commission to the Governor. Nine percent of the total appointments made by the Governor during this period were black (specifically, the county judge appointment in the summer of 1991).

#### iii. Special factors

Plaintiffs have relied heavily on the judicial elections involving black candidates (the Shaw, Buggs, Washington, Prescod, and Micks elections), even contending that elections not involving black candidates should not be analyzed. While the Court has already discussed the statistics on racial polarization for these elections, other important facts about those elections should also be noted.

In particular, in Harrell Buggs's unsuccessful 1978 bid for circuit judge, Buggs

---

**13.** The one judge who did face opposition as an incumbent was white.

**14.** Of the eleven circuit judges who were not initially appointed, five circuit judges were initially elected unopposed.

challenged an incumbent judge. Also, at the time of Alfred Washington's unsuccessful bid for county judge in 1978, Washington had resided in the community for only a short period of time. Washington ran against a person who had been in the community for a much longer period of time with an established law practice.

In Denise Prescod's unsuccessful 1984 bid for county judge, Prescod ran against an incumbent judge who was known as an extremely vigorous campaigner. In addition, in 1984 Prescod had been a member of the Florida Bar for only two years.[15] Another unique factor in the Prescod election was that her opponent, County Judge Westberry, was a non-lawyer judge, and received very poor ratings from the local bar prior to the 1984 election.

### IV. Conclusions of Law [16]

■ The Supreme Court has stated that a district court should perform " 'an intensely local appraisal of the design and impact' " of the electoral system at issue in a vote dilution case. *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781 (quoting *Rogers v. Lodge*, 458 U.S. 613, 621, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982)). The Court must conduct a "searching practical evaluation of the 'past and present reality' " of the electoral system's operation. *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2764 (quoting S.Rep. at 30, 1982 U.S.C.C.A.N. at p. 208). The Court must also evaluate the claim of vote dilution with a "functional," not a formalistic, view of the political process. *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2764. With these general principles in mind, in addition to the legal standards reviewed in section II of this opinion, the Court will evaluate the Plaintiffs' claim of vote dilution.

### A. Ability to draw a majority black subdistrict

■ As a prerequisite to establishing a claim of vote dilution, "[t]he minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766. Plaintiffs presented expert testimony which indicated that a subdistrict containing a 60.09% black voting age population can be created within the Fourth Judicial Circuit and Duval County. The Court finds that Plaintiffs have demonstrated that blacks are a sufficiently large and geographically compact group to constitute a majority in a subdistrict.

### B. Racially Polarized Voting

■ Plaintiffs must prove that racially polarized voting patterns exist in the Fourth Judicial Circuit and Duval County. In order to show racially polarized voting, Plaintiffs must show that blacks as a group are politically cohesive, and that the white majority votes sufficiently as a bloc to enable the majority usually to defeat the minority's preferred candidate. *See Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766.

Before a determination can be made on the issue of racial polarization, a court must decide which elections to analyze. The most probative elections to analyze are those involving the offices under challenge—elections for circuit and county judge. *See, e.g., Carrollton Branch v. Stallings*, 829 F.2d 1547, 1558 (11th Cir.

---

**15.** Prescod would not have been eligible to run for county judge in 1984 under current eligibility requirements.

**16.** The Court finds that Plaintiffs have standing to bring this suit. Plaintiff Jesse Nipper testified that he is a black registered voter in Duval County, and that he is aggrieved on account of his race by the present system for electing circuit and county judges. Plaintiff Nipper has thus satisfied the requirements that he allege that he suffers an actual injury which is fairly traceable to the current electoral system, and that a favorable decision would likely redress that injury. *See S.J. Groves & Sons Co. v. Fulton County*, 920 F.2d 752, 757 (11th Cir.1991). Furthermore, the Court finds that no prudential considerations are present which require this Court to refrain from deciding this case. *See id.* Having found that Plaintiff Nipper has standing, it is unnecessary to reach Defendants' additional arguments regarding the standing of Plaintiff D.W. Perkins Bar Association, because were relief to be granted to Plaintiff Nipper such relief would necessarily inure to all other Plaintiffs and black voters in the Fourth Judicial Circuit and Duval County.

1987). Both parties agree that, at a minimum, elections involving black candidates for circuit and county judge must be analyzed.

On their face, the voting estimates for the Shaw, Buggs, Washington, Prescod, and Micks judicial elections indicate that voting was racially polarized in those elections. Stated differently, the estimates show that blacks were politically cohesive in those judicial elections, and that the white majority voted sufficiently as a bloc to enable the majority to usually defeat the black minority's preferred candidate. The regression estimates and extreme case analyses show that in these elections, black support for the black candidate ranged from 73% to 98%, white support for the black candidate ranged from 3% to 33%, black support for the white candidate ranged from 2% to 27%, and white support for the white candidate ranged from 67% to 97%. See Appendices A & B. These statistics would ordinarily make out a sufficient showing of racial polarization in these six judicial elections.

However, the judicial elections involving black candidates in this case are stale. The most recent of these elections, the Micks and Prescod bids for Duval County Judge, occurred in 1984, approximately six years prior to the filing of this lawsuit. All of the other four elections—the 1972 Shaw circuit judge primary and runoff, the 1978 Buggs circuit election, and the 1978 Washington county election—were over a decade old when this case was filed. These stale elections set this case apart from other vote dilution cases, where normally at least some elections for the offices under challenge occurring within one or two years of the lawsuit are relied upon. See, e.g., Gingles, 478 U.S. 30, 106 S.Ct. 2752; Solomon, 899 F.2d 1012. If no black candidates have participated in elections for the offices under challenge, then recent results from elections similar to the elections under challenge are often used. See, e.g., Hall, 955 F.2d at 1570–71; Carrollton, 829 F.2d at 1558.

■ Reliable election results from elections in the offices under challenge are particularly important in this case because of the uniqueness of judicial elections. Elections for circuit and county judge are nonpartisan, and are of a much lower profile than most partisan elections. As illustrated by Dr. Haworth's statistics on the number of voters who show up to the polls but do not vote for a judicial candidate, elections for circuit and county judge are of substantially lesser interest to the local electorate than are partisan, non-judicial elections. Thus, it is crucial to have reliable judicial election results in a vote dilution challenge to a judicial election system, simply because most exogenous elections are substantially dissimilar to judicial elections. Cf. League of United Latin American Citizens v. Clements, 914 F.2d 620, 631 (5th Cir.1990), rev'd, Houston Lawyers, 111 S.Ct. 2376 (noting that "[j]udicial officers and judicial selection processes are sui generis...").

■ The Court is not aware of any statute of limitations that applies to vote dilution cases. However, the stale nature of the judicial elections involving black candidates has some adverse effect on the probative value of those elections.

■ Defendants contend that all elections for circuit and county judge from 1972 to 1990 must be analyzed before this Court can determine whether racially polarized voting exists, regardless of whether a black candidate participated in the election or not. Considering this broader set of elections, the black candidate of choice won 68% of the contested circuit court elections, and the black candidate of choice won 58% of the contested county court elections. Clearly, when all elections for circuit and county judge from 1972 to 1990 are considered, Plaintiffs have failed to prove that the white majority votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate. See Gingles, 478 U.S. at 49, 106 S.Ct. at 2765–66.

Due to the stale nature of the judicial elections involving black candidates, a compelling argument can be made that all elections for circuit and county judge from 1972 to 1990 should be considered in determining racial polarization, regardless of the

race of the candidates. Furthermore, a plurality of the Supreme Court has stated that "the race of the candidate *per se* is irrelevant to racial bloc voting analysis." *Gingles,* 478 U.S. at 67, 106 S.Ct. at 2775 (emphasis in original); *see also Carrollton,* 829 F.2d at 1558 (stating that "it is the race of the voter, not of the candidate, which is of concern in racial polarization claims"). The *Gingles* plurality went on to state that "[u]nder § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group,* not the race of the candidate, that is important." *Gingles, supra* (emphasis in original). If this statement were the law of the land, this Court would be *required* to give equal weight to all elections for circuit and county judge from 1972 to 1990, regardless of the race of the candidates.

For the following reasons, the Court will give some weight to the circuit and county judicial elections between 1972 and 1990 that did not involve black candidates, although the judicial elections involving black candidates are of greater importance. First, only a plurality of the Supreme Court agreed that the race of the candidate is irrelevant. *See Gingles,* 478 U.S. at 82–83, 106 S.Ct. at 2783 (White, J., concurring), and 478 U.S. at 101, 106 S.Ct. at 2792 (O'Connor, J., concurring in the judgment). Second, the *Gingles* Court itself only analyzed elections involving black candidates, although this may have merely been a result of the record developed by the district court.

Intermediate appellate courts are also divided on this issue. The Fifth Circuit has held that district courts should focus only on elections involving minority candidates unless elections involving only white candidates offer minority voters the choice of a "viable minority candidate." *See Campos v. City of Baytown,* 840 F.2d 1240, 1245 (5th Cir.1988).[17] The Eleventh Circuit, in

*Carrollton,* noted that a plurality of the Supreme Court has stated that it is the race of the voter, not of the candidate, which is of concern in vote dilution claims. *See Carrollton,* 829 F.2d at 1558. However, the *Carrollton* court had no occasion to decide whether elections not involving minority candidates should be considered.

■ Therefore, without any specific guidance from the appellate courts, this Court will fashion a rule based on the available precedent. This Court will refuse to adopt the Plaintiffs' argument that a black candidate will automatically be preferred by black voters over a white candidate. While this Court does not sit as a pollster, it is fair to say that in a judicial election in Duval County between Clarence Thomas and William Brennan, there would probably be a substantial difference of opinion among black voters as to their candidate of choice. At the same time, the appellate courts do appear to give elections involving black candidates more importance than elections that do not involve black candidates. For these reasons, the Court will give the circuit and county judicial elections involving black candidates primary importance, and give the circuit and county judicial elections involving only white candidates secondary importance.

■ Evaluating the evidence under this standard, Plaintiffs have failed to prove that racially polarized voting exists in the Fourth Judicial Circuit and Duval County. When a black candidate runs for judicial office, the black candidate is always supported by the overwhelming majority of black voters; however, as the following discussion will illustrate, the black candidate is not usually defeated by white bloc voting in the absence of special circumstances.

17. Determining who is or is not a "viable minority candidate" would seem particularly problematic in judicial elections, since judges do not represent any one particular group. The Fifth Circuit would find it proper to focus on elections not involving minority candidates if it could be shown that minority turnout was sufficiently similar regardless of the race of the candidate. *See Campos,* 840 F.2d at 1245. The Court finds some merit in this basic principle. Unfortunately, insufficient evidence of turnout comparisons for judicial elections involving black candidates and judicial elections involving only white candidates was provided to the Court.

Several reasons support this Court's conclusion. First, as noted earlier, the judicial elections involving black candidates are stale, thus providing a less reliable indicator of current polarization. Second, when judicial elections not involving black candidates are included in the analysis, the black candidate of choice for circuit or county judge wins the majority of the time.

■ Most importantly, special circumstances in several of the judicial elections involving black candidates are damaging to the Plaintiffs' attempt to prove racial polarization. In *Gingles*, the Supreme Court stated that minority electoral *success* does not foreclose a vote dilution claim if that success can be explained by special circumstances, such as the minority candidate running unopposed, or the fact that the minority candidate ran as an incumbent. *See Gingles*, 478 U.S. at 57, 106 S.Ct. at 2770. The converse of this proposition must also be true. That is, any balanced consideration of a vote dilution claim should also take into account any special circumstances that may explain minority electoral *failure* in a polarized contest. In particular, the same special circumstances identified by the *Gingles* Court to explain minority success—incumbency and the absence of an opponent—should be considered in analyzing elections in which minority candidates have been defeated.

■ In this case, special circumstances exist in at least two of the six elections for circuit and county judge in which black candidates participated. In the

1978 election for circuit judge involving black candidate Harrell Buggs, Buggs challenged an incumbent judge. Similarly, in the 1984 election for county judge involving Denise Prescod, Prescod also challenged an incumbent judge.[18] Given the undeniable power of incumbency in judicial elections, the probative value of these two elections is significantly diminished on the issue of racial polarization.[19] Thus, of the six judicial elections for circuit and county judge involving black candidates, only the 1972 Shaw runoff, the 1978 Washington election, and the 1984 Micks election can be considered strong evidence of racial polarization in the absence of special circumstances. The Buggs and Prescod elections are better viewed as evidence of the power of incumbency rather than as strong evidence of racial polarization. And, of course, Shaw actually "won" the 1972 circuit judge primary by finishing first and advancing to the runoff.[20] Therefore, in only three of the six judicial elections for circuit and county judge did white bloc voting operate to defeat the black candidate in the absence of special circumstances. This fifty percent showing of black electoral failure falls short of the *Gingles* requirements, since the Supreme Court has stated that vote dilution only occurs where white bloc voting *usually* is able to defeat the black candidate, in the absence of special circumstances.[21]

The exogenous elections, to the extent that they are relevant, tend to support these conclusions. Unquestionably, the

---

**18.** Plaintiffs correctly note that the incumbent judge challenged by Prescod received very poor ratings from the local bar. However, this factor is offset by the fact that Prescod ran for judicial office despite only having been admitted to the Florida Bar two years earlier. In the Court's view, neither candidate's qualifications in 1984 were particularly helpful to their respective campaigns, and in all probability incumbency ultimately proved to be the deciding factor.

**19.** It is also worth noting that, in a 1978 election for county judge, Alfred Washington ran against a candidate who had been in the local community for a much longer period of time than Washington. Washington's opponent also had an established and successful law practice.

**20.** Shaw's victory in the primary must be counted as an election in which a black candidate

won, despite Shaw's ultimate defeat in the runoff. The majority vote requirement is taken into account later in the analysis, under the section entitled "Electoral Structure." To not count Shaw's primary victory as evidence of minority electoral success, but to later count the majority vote requirement against the Defendants, would illogically give weight to the same factor twice.

**21.** Even if Shaw's "win" in the primary is not considered, the black candidate has been defeated three out of five times. The Court finds that this sixty percent showing of black electoral failure also is insufficient to show that the black candidate *usually* is defeated due to white bloc voting.

election which is most analogous and relevant to the elections under challenge is Joseph Hatchett's successful 1976 election to the Florida Supreme Court. Hatchett won almost unanimous support from black voters and won a majority of white voters in the circuit and county. However, Hatchett, a black, ran as an incumbent in the 1976 election, and thus the probative value of his election is diminished by the special circumstance of incumbency.

The Court further finds that statistical evidence from other exogenous elections is inconclusive on the issue of racial polarization. Black candidates achieved some electoral success in local at-large elections in the 1970s, and recently a black candidate was successful in a Republican primary election. On the other hand, several recent presidential and other high profile elections have been characterized by racially polarized voting. In any event, these elections are entitled to little weight due to the significant differences between judicial and non-judicial elections in Florida, and because of the significant number of judicial elections available for analysis.

In evaluating the issue of racial polarization, the Court has also considered non-statistical evidence (such as lay testimony), and has reviewed the other Senate Report factors. *See Hall*, 955 F.2d at 1573. The lay testimony confirmed much of the statistical analysis; that is, the lay testimony showed that black judicial candidates were defeated by white bloc voting in three instances, but that important special circumstances were present in the Buggs and Prescod elections. As for the Senate Report factors (which are fully discussed *infra*), these factors overwhelmingly support and confirm the Court's findings on the issue of racial polarization.

In summary, after considering all the relevant evidence, the Court finds that Plaintiffs have failed to make a sufficient showing of racially polarized voting in the Fourth Judicial Circuit and Duval County. This finding alone requires a ruling in favor of the Defendants. However, in the interests of providing a comprehensive opinion, the Court will consider Defendants' proof of other objective factors in rebuttal that indicate, under the totality of the circumstances, that the voting community is not driven by racial bias. *See Solomon*, 899 F.2d at 1035 (Tjoflat, J., concurring specially).

### C. Electoral Structure

■ The Court finds that the electoral structure of the Fourth Judicial Circuit and Duval County has little, if any, effect on black voters' opportunity to participate in the political process and to elect representatives of their choice. As the above discussion has illustrated, judicial elections are at-large elections. The effect of the at-large nature of the elections has been considered above in the Court's analysis of racial polarization in the Fourth Judicial Circuit and Duval County.

The Court further finds that the Fourth Judicial Circuit and Duval County are not unreasonably large election districts. The print, radio, and television media provide all candidates with an avenue to reach the circuit and county voters. The state also has valid interests—promoting administrative flexibility in scheduling, and deterring forum shopping—in having a multi-county circuit court and a single county court, as opposed to a subdistrict system. Furthermore, Plaintiffs have failed to show that the size of the election districts impedes black voters in any material way. The black voting age population is registered in a greater proportion than is the white voting age population, and no showing has been made that the size of these election districts has any adverse effect on black voter turnout. To hold otherwise would be to rely on pure speculation. Similarly, there is no convincing evidence that the size of these election districts impedes black judicial candidates in any material way.

■ Florida also employs a majority vote requirement, a numbered place system, and staggered terms. The majority vote requirement can result in a situation where the black candidate advances in the primary but loses in a runoff election, such as the 1972 circuit court election involving

Leander Shaw.[22] However, the Court finds that Florida has a valid interest in requiring that a successful judicial candidate gain the support of a majority of the voters. This requirement also works to help black and white incumbent judges remain in office, because the name recognition provided by incumbency provides the incumbent a substantial advantage in gaining majority support.

▮ Florida also maintains a numbered place system, whereby a candidate for circuit or county judge must run for a designated seat. This requirement undeniably protects incumbents, since a non-incumbent candidate is virtually required to challenge an incumbent judge, unless the seat is open. The Court finds that the use of a numbered place system furthers the State's interest in reducing the number of contested judicial elections, by not pitting incumbent judges against each other in each election. Furthermore, the numbered place requirement helps black and white voters elect judges of their choice by protecting both black and white incumbent judges from facing a contested election at the expiration of each term. Indeed, only one of the forty current circuit and county judges has faced electoral opposition after his or her initial appointment or election.

▮ Finally, the Court finds that the use of staggered terms has no effect on black voters' ability to participate in the political process and elect candidates of their choice. This requirement simply serves the State's legitimate interest in maintaining a stable judiciary by ensuring that there will not be large-scale judicial turnover in any single electoral year.

### D. History of Discrimination

▮ It is undisputed that Florida has a history of discrimination against its black citizens. In the past, Florida has employed devices which have had the purpose or effect of depriving black voters of electoral power. These devices include the expunge-ment of black voters from voting lists, a poll tax, a multiple ballot statute, the direct primary, and a requirement that officeholders post bonds.

▮ However, none of these discriminatory devices have been in effect for decades. Florida's history of official discrimination in the areas of public transportation and education is similarly remote. This is important, since a state's history of discrimination is relevant only to the extent that it affects the rights of the members of the minority group to register, to vote, or otherwise to participate in the democratic process. *See Gingles*, 478 U.S. at 36–37 and 69, 106 S.Ct. at 2759 and 2776; *see Carrollton*, 829 F.2d at 1561 (requiring some causal connection between past discrimination and low levels of black political participation).

Statistics on political participation indicate that Florida's history of discrimination has no cognizable current impact on black voters' current ability to participate in the political process. The black voting age population in the Fourth Judicial Circuit and Duval County is actually registered at a higher rate than the white voting age population. No evidence introduced at trial indicated that Florida's history of discrimination has any negative impact on black voter turnout in recent elections.[23] In fact, testimony from black voters indicated that they have had no problems registering, voting, or participating in judicial elections. While there does appear to be a higher "rolloff" effect in judicial elections for blacks than whites, there is no evidence that this "rolloff" effect is attributable in any way to Florida's history of discrimination. In sum, the Court finds that Florida's history of discrimination has no current impact on black voters' ability to participate in the political process for electing judges in the Fourth Judicial Circuit and Duval County.

---

**22.** The evidence also showed that, from 1972 to 1984, five white candidates led the primary only to lose in the runoff election.

**23.** No comprehensive evidence on black and white voter turnout was presented to the Court.

### E. Socio-economic Effects of Discrimination

■ It is undisputed that blacks in Florida still suffer from the socio-economic effects of past discrimination. Blacks in the Fourth Judicial Circuit and Duval County have lower median incomes than whites, are more likely to have incomes below the poverty line, have lower rates of education, lower rates of car ownership, and are more likely to be unemployed. Blacks in this area are simply not as well off economically as whites.

However, the continuing socio-economic effects of past discrimination are only relevant in this case if they continue to "hinder [the minority group's] ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37 and 69, 106 S.Ct. at 2759 and 2776 (stating that the relevant inquiry is the "impact of low socioeconomic status on a minority group's level of political participation."); *see Hall*, 955 F.2d at 1572; *Carrollton*, 829 F.2d at 1561–62. Based on the evidence in this case, the Court finds that the ability of black voters to participate effectively in the political process for electing circuit and county judges is not materially affected by the continuing socio-economic effects of past discrimination. As noted in the preceding section, black voters are actually registered at a higher rate than white voters, and there is no evidence to indicate that the lingering effects of discrimination have any material effect on black voter turnout or rolloff.

■ The Court also finds that the costs of running for judicial office are not a significant barrier to prospective black candidates. Because the costs of maintaining a judicial campaign (at least in the numerous unopposed elections) are small in comparison to most non-judicial elections, the economic disparities between blacks and whites are largely immaterial to the election of circuit and county judges. In addition, the filing fees for judicial candidates are not "enormous," contrary to Plaintiffs' characterizations, and can be avoided altogether by a petition method, *but cf. McMillan v. Escambia County*, 748 F.2d 1037, 1044 n. 18 (11th Cir.1981), or can be paid with funds obtained from local lawyers or other sources.

### F. Candidate Slating Process

There is no candidate slating process for judicial office in the Fourth Judicial Circuit or Duval County. Accordingly, Defendants have demonstrated that blacks are not prevented from seeking judicial office in the Fourth Judicial Circuit and Duval County by means of a candidate slating process.

### G. Use of Racial Appeals in Campaigns

White candidates for judicial office in the Fourth Judicial Circuit and Duval County have not used racial appeals to obtain judicial office for themselves or to exclude black candidates from judicial office. Thus, Defendants have demonstrated that racial appeals have not been used to exclude blacks from circuit or county judgeships.

### H. Extent of Electoral Success

■ The extent of minority electoral success is one of the two most important factors in this case, along with evidence of racial polarization. *See Gingles*, 478 U.S. at 48–49 n. 15, 106 S.Ct. at 2765–66 n. 15. At the time of trial, three of the forty circuit and county judges were black. One of these three was appointed to a vacancy after this case was filed. Thus, at the time of trial, seven and one-half percent of the circuit and county judges were black, and, at the time this case was filed, five percent of the circuit and county judges were black.

These percentages are low in comparison with the black percentage of the total electorate. However, Florida's eligibility requirements for circuit and county judges significantly limit the number of qualified persons. Only lawyers who are members of the Florida Bar with five years experience are eligible to run for circuit or county judge. Statistics indicate that black attorneys who are members of the Florida Bar with five years experience account for only

three percent of the total eligible attorneys in the circuit, and only two and one-half percent of the total attorneys with the likely range of experience for circuit and county judges at the time of their selection.[24] Thus, since the percentage of black circuit and county judges is substantially greater than the percentage of black lawyers who are eligible or likely to be a circuit or county judge,[25] it is an undeniable fact that black attorneys have actually had greater success in recent years in obtaining circuit or county judgeships than have white attorneys.[26] Plaintiffs' reliance on comparisons of the racial composition of the population and the racial composition of the local judiciary is illogical and contrary to recent Supreme Court precedent. *Cf. Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989) (stating, in the employment discrimination context, that the " 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the *qualified* ... population in the relevant labor market.' ") (quoting *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)); *City of Richmond v.*

*J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) (stating that "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task.").

 It is true that the current black circuit and county judges all obtained office initially by appointment. However, this is also true for many other judges on these courts: seventeen of the twenty-eight current circuit judges, and five of the twelve county judges, were initially appointed to the court.[27] Furthermore, *Gingles* requires this Court to take a "functional" view of the political process, with a "searching practical evaluation of the past and present reality." *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2764. A functional and realistic view of the political process for selecting circuit and county judges must include the appointment process in addition to the at-large nature of the system. The appointment process and the access it has provided to black judicial applicants cannot, and should not, be ignored.

**24.** Statistics for Duval County are virtually the same.

**25.** Florida's history of official discrimination in the operation of its publicly sponsored law schools is too remote to be the proximate cause of the low black representation in the local bar. Dr. Haworth's analysis of the pool of eligible lawyers who would likely be candidates for circuit and county judge convincingly indicates that all attorneys in the likely pool of candidates *would* have entered law school at least several years after official discrimination had ended. In addition, the number of blacks in Florida's law schools has remained relatively static in recent years, see Ethnic Bias Study Commission report at 96–97, indicating that low black representation in the local bar is the result of causes not directly attributable to the State of Florida.

**26.** Section two of the Voting Rights Act specifically states that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." This provision does not speak directly to the situation where an office has special eligibility requirements, such as a judicial office in which bar membership is a requirement of obtaining office. If the princi-

ple embodied in section two's disclaimer about proportional representation does apply to this case, then Plaintiffs' claim of vote dilution fails on this basis alone: the percentage of black representation in the circuit and county judiciary is higher than the percentage of black membership in the local bar. At a minimum, the significant black representation in the local judiciary is an important factor to be considered under the totality of the circumstances. *See Gingles*, 478 U.S. at 77, 106 S.Ct. at 2780 (stating that persistent proportional representation is generally inconsistent with a successful section two claim).

**27.** Because appointment is the primary method by which local judges initially obtain office, the case of *United States v. Marengo County Comm'n*, 731 F.2d 1546 (11th Cir.1984), is clearly distinguishable. In *Marengo*, the Eleventh Circuit said that the appointment of one black to the school board did not establish black electoral success in any real sense. *Id.* at 1572. The facts in the case at bar are far different from *Marengo*. Appointment to the circuit or county bench is not something that occurs in isolated instances. Rather, appointment is the primary method of obtaining office for white and black judges of these courts.

The appointment process, which the evidence shows is equally open to black and white applicants, is particularly important because of the powerful nature of judicial incumbency. The evidence shows that incumbent circuit and county judges are rarely challenged and almost never defeated. Thus, the appointment of a judge, black or white, has great significance. The appointed judge will be almost assured of a lengthy and unchallenged tenure on the bench. This proposition is true for black and white judges alike. While the current black judges who have stood for reelection have been reelected unopposed, Justice Hatchett's 1976 reelection to the Florida Supreme Court strongly indicates that the incumbent black circuit and county judges have the opportunity to be reelected even if they are challenged. Accordingly, the Court finds that blacks have experienced electoral success, and that eligible blacks are currently represented in the circuit and county judiciary at a rate that is higher than the rate of representation for eligible whites.

### I. Responsiveness

The evidence indicates that the current circuit and county judges are fair and impartial in the performance of their judicial duties. Accordingly, to the extent that this factor is relevant, the Court finds that there is no lack of responsiveness by these judges to the needs of the local black community.

There was testimony that a perception exists among the black community that the judicial system is an exclusive white-male club, and that it is difficult for blacks to obtain just treatment in the judicial system. This perception was alluded to by a sitting black circuit judge and a prominent local black attorney. Witnesses also agreed that this perception is erroneous in that the circuit and county judges are fair, be they white or black.

The Voting Rights Act is not directed to "perceptions" about "the system." Instead, the Act is directed to remedy inequalities in voting where the minority group has less opportunity to participate in the political process and to elect representatives of their choice. Thus, the perception about the judicial system that exists in the black community is irrelevant to this case. The evidence suggests that it is also inaccurate. Furthermore, as the discussion in the preceding section indicates, eligible blacks are actually represented in the judiciary in a greater proportion than eligible blacks are represented in the local bar, a fact which directly contradicts the minority group's erroneous perception about the judiciary.

### J. State Interests in Maintaining the Current System

The Court has already discussed Florida's eligibility requirements for circuit and county judge. Those requirements need not be repeated here. In any event, Florida's eligibility requirements are not under challenge in this case, and are eminently reasonable.

Florida has also asserted a state interest in support of the at-large nature of the current system; namely, that a state has an interest in maintaining a link between a trial judge's jurisdiction and the judge's elective base. The Defendants argue, and the Court agrees, that the link between a judge's jurisdiction and elective base serves to foster judicial independence, or at least the appearance of judicial independence. In a system of single-member subdistricts, there would be some pressure on elected judges to respond to specific electoral constituents when one of their constituents is involved in litigation against a nonresident of that subdistrict. The at-large system eliminates this pressure by linking the judge's jurisdiction and elective base. *Cf. Houston Lawyers*, 111 S.Ct. at 2381 (stating that "the State's interest in maintaining an electoral system—in this case, Texas' interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters— is a legitimate factor to be considered by

courts among the 'totality of circumstances' ").

■ Plaintiffs' contend that the state's interest in maintaining the current system is properly considered at the remedy stage of the litigation. This argument misses the point. The Supreme Court itself has stated that a state's interest in maintaining an electoral system is a legitimate factor to be considered under the totality of the circumstances in the liability phase of a section two case.[28] *See Houston Lawyers*, 111 S.Ct. at 2381.[29] In sum, the Court finds that Florida has a legitimate interest in maintaining the current at-large system of electing judges in the Fourth Judicial Circuit and Duval County.[30]

## V. Summary of Vote Dilution Issue

■ The Court finds that Plaintiffs have failed to prove that the at-large system for electing judges in the Fourth Judicial Circuit and Duval County violates section two of the Voting Rights Act, for the following reasons. First, Plaintiffs have failed to prove that black candidates for circuit and county court are usually defeated by white bloc voting in the absence of special circumstances. This proposition is true if only judicial elections involving black candidates are considered, and is also true if judicial elections not involving black candidates are included in the analysis.[31] Second, even if Plaintiffs had made a sufficient showing of racial polarization, Defendants have offered overwhelming proof of objective factors in rebuttal that demonstrate, under the totality of the circumstances, that the social conditions in the Fourth Judicial Circuit and Duval County are such that their interaction with the electoral scheme do not, and will not, result in voting discrimination in the judicial elections under challenge. Specifically, Defendants have proved that there are legitimate state interests in maintaining the current system, that eligible blacks have achieved more than proportional representation on the circuit and county courts, that no racial appeals or candidate slating processes have been used to exclude black voters or candidates from the electoral process, that the current circuit and county judges are responsive to the needs of all citizens, and that Florida's history of discrimination and the lingering effects thereof do not have a material current impact on black voters' ability to participate in the political process. Accordingly, the Court will rule for the Defendants and against the Plaintiffs on the claim of vote dilution.

## VI. Constitutional Claim

■ Plaintiffs also claim that the current system for electing circuit and county judges violates the Fourteenth and Fifteenth Amendments to the United States Constitution. To succeed on this constitutional claim, Plaintiffs must prove that the system was conceived or operated as a purposeful device to further racial discrimination. *See Mobile v. Bolden*, 446 U.S. 55, 62–70, 100 S.Ct. 1490, 1497–1501, 64 L.Ed.2d 47 (1980).

■ The Court initially rejects Plaintiffs' contention that the evidence sub-

28. Plaintiffs contend that a remedial approach other than subdistricting, such as cumulative voting, would satisfy the state's interest in linking jurisdiction with elective base while promoting greater opportunities for black voters. The Court has no occasion to consider this contention, since proposed remedies are relevant only if a violation is proved. Furthermore, nothing in *Houston Lawyers* or the history of section two suggest that the electoral system chosen by a state must be narrowly tailored to the state's interests in maintaining that system.

29. Plaintiffs also contend that "[a]sserted state interests in at-large election systems have re-

peatedly been rejected as a defense in Section 2 cases." This assertion ignores the Supreme Court's observations in *Houston Lawyers*.

30. As noted in Judge Higginbotham's concurring opinion in *LULAC v. Clements*, 914 F.2d at 645–51, fundamental concepts of federalism counsel against disregarding a state's basic choice of how to structure its trial court system.

31. Taken as a whole, the exogenous elections, the other Senate Report factors, and the non-statistical evidence tend to confirm these conclusions.

mitted in support of the section two claim establishes an equal protection violation. None of this circumstantial evidence even remotely supports the inference that the current system of electing circuit and county judges was conceived or operated with the intent to discriminate on the basis of race. The main case relied upon by Plaintiffs in this regard, *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), is distinguishable in many respects from the case at bar. In *Rogers*, no black had ever served in the office under challenge, black voter registration lagged behind white voter registration, blacks were excluded from participating in party politics, and elected officials were completely unresponsive to the needs of the black community. *See id.* 458 U.S. at 623–26, 102 S.Ct. at 3279–80. As the Court's findings on the vote dilution issue clearly demonstrate, none of these factors is present in this case.

■ Furthermore, the Court finds that Plaintiffs have offered no convincing direct evidence of discriminatory intent. On this issue, the Court credits the testimony of Dr. William Rogers. Dr. Rogers testified that Florida has alternated between electing and appointing circuit judges for over a century,[32] and that these changes largely reflect competing notions of Jacksonian democracy and the desire to depoliticize the judiciary.

Specifically, in 1913 Florida required circuit judges to be nominated in the Democratic primary, and then appointed by the governor with the consent of the senate. In 1942, Florida changed its system by requiring circuit judges to run in partisan, at-large elections, with the new system scheduled to take effect in the 1948 elections. There were several reasons for the 1942 shift, none of which was based on a purpose to discriminate against blacks. First, at-large elections eliminated the real

possibility that a powerful state senator could block a circuit judge's appointment by the governor. Second, at-large elections were a natural result of a renewed wave of Jacksonian democracy in Florida politics which occurred during World War II. Finally, Democrats had little to fear from Republican or black opposition in a general election, since both the Republican party and black voters had little political power at the time. In addition, sad as it may be, few Floridians at the time even considered the possibility of having blacks serve as circuit judges. This is evidenced by the fact that racial discrimination against blacks was never mentioned as a part of the legislative process which triggered the 1942 change to partisan, at-large elections.

In 1971, Florida passed a law which called for the nonpartisan, at-large election of circuit and county judges by majority vote. One year later, Florida made major changes to its constitution with respect to the state's judiciary. In the 1972 revision, Florida retained the at-large, nonpartisan election system for circuit and county judges, but also required circuit judges to have been a members of the Florida Bar for five years, to be voters and reside in their districts, and to retire at age seventy. The appointment process was revamped with the creation of judicial nominating commissions. The tenure of circuit judges was set at six years, while county judges had a tenure of four years. Both black and white voters supported the 1972 revision. The revision was supported by a prominent civil rights advocate, Talbot "Sandy" D'Alemberte, and by the two black legislators in the 1972 legislature.

In support of their contention that the 1942 shift to at-large elections was motivated by racial discrimination, Plaintiffs rely on two main cases, *McMillan v. Escambia County*, 638 F.2d 1239 (5th Cir.1981), and *NAACP v. Gadsden County School Bd.*,

---

**32.** Florida has alternated between the election and appointment of judges many times: election was chosen in the 1840s, appointment as of 1861, election in 1865, appointment as of 1868,

a system of primary election with appointment by the governor as of 1913, and back to election as of 1948.

**1550**

691 F.2d 978 (11th Cir.1982). These cases found that the decision to change the method of electing school board members from a single-member district system to an at-large system was motivated by racial discrimination. However, the shift from single-member districts to at-large elections in *Escambia* and *Gadsden* was made immediately *after* the direct or "all-white" primary had been declared unconstitutional. *See Escambia*, 638 F.2d at 1245–46 (stating that the "abrupt, unexplained departure from that forty-year policy [of single-member districts] upon the heels of the white primary's demise justifies the district court's conclusion that the change was racially motivated."). By contrast, Florida made the decision to elect circuit judges in at-large elections in 1942, *before* the direct primary was declared unconstitutional. The decision to submit the election of judges to the entire electorate gave blacks (and Republicans, for that matter) at least some voice in those elections at a time when the direct primary still operated in non-judicial elections. This further indicates that the 1942 decision to elect circuit judges in partisan, at-large elections was not racially motivated.

In addition, it is misleading to say that there was a "shift" to at-large elections for circuit judges in 1942, because circuit judges were elected at-large in the direct primary established in 1913. It is true that in 1915, Florida required candidates for multi-member offices to run in single-member district primaries. However, Dr. Rogers's research indicates that circuit judges were unaffected by the 1915 legislation, and continued to be elected at-large in the primary. Thus, the decision to elect judges at-large in 1942 was simply a decision to do away with the primary system with respect to the election of circuit judges, and merely continued the at-large method in a general election. This fact alone distinguishes the *Escambia* and *Gadsden* cases, which struck down the abrupt change from single-member districts to an at-large system

in the years following the end of the direct primary.

Similarly, there is no evidence of racial motivation in Florida's decision in 1913 to nominate circuit judges in the primary with appointment by the governor. Since blacks had already been eliminated as voters in 1913 by other means, further discrimination would have been an act of redundancy. *Cf. McGill v. Gadsden Cty. Comm'n*, 535 F.2d 277, 280–81 (5th Cir.1976) (holding that, because blacks were essentially disenfranchised already by less subtle electoral mechanisms, the shift to at-large election of county commissioners in 1900 was not racially motivated).

With respect to county judges, Plaintiffs offered little, if any, direct evidence or argument that the current system of electing county judges was conceived or maintained for a discriminatory purpose. Dr. Rogers's report thoroughly surveyed the history of the county courts and found no evidence of an intent to discriminate against blacks in the decision to elect county judges in at-large, nonpartisan contests. The Court adopts this report as findings of fact on this issue.

In sum, the Court finds no evidence that the current system for electing circuit and county judges was established or has been maintained for a discriminatory purpose. The Court finds that Florida's 1942 decision to elect circuit judges in at-large elections was not racially motivated, but rather was driven by a Jacksonian desire to make the judiciary accountable to the people. With respect to the 1971 and 1972 revisions of the system, there is simply no shred of evidence that those revisions were adopted or have been maintained for a discriminatory purpose.

Accordingly, it is now

ORDERED AND ADJUDGED:

In accordance with this opinion, the Clerk is directed to enter judgment for the Defendants and against the Plaintiffs.

DONE AND ORDERED.

## APPENDIX A.

1. Summary of Results of Ecological Regressions for Judicial Elections

| | % of Black Voters Voting for Black Cand.(s) | % of Black Voters Voting for White Cand.(s) | % of White Voters Voting for Black Cand.(s) | % of White Voters Voting for White Cand.(s) | $R^2$ | Stat. Signif. |
|---|---|---|---|---|---|---|
| **Fourth Circuit** | | | | | | |
| **1972 Primary** | | | | | | |
| Leander Shaw | | | | | | |
| Circuit | 92 | 8 | 24 | 76 | .94 | .00001 |
| Duval Co. Only | 93 | 7 | 23 | 77 | .95 | .00001 |
| **1972 Runoff** | | | | | | |
| Leander Shaw | | | | | | |
| Circuit | 97 | 3 | 33 | 67 | .95 | .00001 |
| Duval Co. Only | 98 | 2 | 32 | 68 | .90 | .00001 |
| **1978 Primary** | | | | | | |
| Harrell Buggs | | | | | | |
| Circuit | 82 | 18 | 3 | 97 | .97 | .00001 |
| Duval Co. Only | 81 | 19 | 4 | 96 | .98 | .00001 |
| **Duval Co. Judge** | | | | | | |
| 1978 Primary A. Washington | 88 | 12 | 13 | 87 | .97 | .00001 |
| 1984 Primary Group 4 Denise Prescod | 73 | 27 | 31 | 69 | .82 | .00001 |
| 1984 Primary Group 8 Deitra Micks | 76 | 24 | 4 | 96 | .90 | .00001 |

## APPENDIX B.

1. Summary of Extreme Case Analysis in Judicial Elections