# HOUSTON LAWYERS' ASSOCIATION ET AL. *v.* ATTORNEY GENERAL OF TEXAS ET AL.

No. 90–813.   Argued April 22, 1991—Decided June 20, 1991*

---

*Together with No. 90–974, *League of United Latin American Citizens et al.* v. *Attorney General of Texas et al.*, also on certiorari to the same court.

*Julius LeVonne Chambers* argued the cause for petitioners in both cases. With him on the briefs for petitioners in No. 90–813 was *Charles Stephen Ralston. Susan Finkelstein, Edward B. Cloutman III, E. Brice Cunningham, William L. Garrett, Rolando L. Rios,* and *David Hall* filed a brief for petitioners in No. 90–974.

*Renea Hicks,* Special Assistant Attorney General of Texas, argued the cause for respondents in both cases. With him on the brief for state respondents were *Dan Morales,* Attorney General, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, and *Javier P. Guajardo,* Special Assistant Attorney General. *J. Eugene Clements* filed a brief for respondent Wood. *Robert H. Mow, Jr., David C. Godbey,* and *Bobby M. Rubarts* filed a brief for respondent Entz.†

---

†Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Assistant Attorney General Dunne, Deputy So-*

Justice Stevens delivered the opinion of the Court.

In *Chisom* v. *Roemer, ante*, p. 380, we held that judicial elections, and, more specifically, elections of justices of the Supreme Court of Louisiana, are covered by §2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended in 1982, 42 U. S. C. §1973. In these cases we consider whether the statute also applies to the election of trial judges in Texas. We hold that it does.

## I

Petitioners in No. 90–974 are local chapters of the League of United Latin American Citizens, a statewide organization composed of both Mexican-American and African-American residents of the State of Texas, and various individuals. They brought this action against the attorney general of

licitor General *Roberts,* Deputy Assistant Attorney General *Clegg, Paul J. Larkin, Jr., Jessica Dunsay Silver,* and *Mark L. Gross;* and for the Lawyers' Committee for Civil Rights Under Law by *Frank R. Parker, Robert B. McDuff, Brenda Wright, Robert F. Mullen, David S. Tatel, Norman Redlich, Samuel Rabinove, Richard T. Foltin, Antonia Hernandez, Judith Sanders-Castro, Laughlin McDonald, Neil Bradley, Kathleen L. Wilde,* and *Mary Wyckoff.*

Briefs of *amici curiae* urging affirmance were filed for the State of Georgia by *Michael J. Bowers,* Attorney General, *Carol Atha Cosgrove,* Senior Assistant Attorney General, and *David F. Walbert;* for the State of Tennessee et al. by *Charles W. Burson,* Attorney General of Tennessee, *John Knox Walkup,* Solicitor General, and *Michael W. Catalano,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Winston Bryant* of Arkansas, *Robert A. Butterworth* of Florida, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Lacy H. Thornburg* of North Carolina, *Nicholas Spaeth* of North Dakota, *Robert H. Henry* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, and *Ken Eikenberry* of Washington; for the Florida Conference of Circuit Judges et al. by *John F. Harkness, Jr., William F. Blews, Ronald A. Labasky, James Fox Miller, Benjamin H. Hill III,* and *Barry S. Richard;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Anthony T. Caso.*

*Edwin F. Hendricks* filed a brief for the American Judicature Society as *amicus curiae.*

Texas and other officials (respondents) to challenge the exist-
ing at-large, countywide method of electing state district
judges. Although the original challenge encompassed the
entire State and relied on both constitutional and statutory
grounds, the issues were later narrowed to include only a
statutory challenge to the voting methods in just 10 coun-
ties.* Petitioners in No. 90–813 are the Houston Lawyers'
Association, an organization of African-American attorneys
who are registered voters in Harris County, and certain indi-
viduals; they are intervenors, supporting the position of the
original plaintiffs. Because all of the petitioners have the
same interest in the threshold issue of statutory construction
that is now before us, we shall refer to them collectively as
"petitioners."

Texas district courts are the State's trial courts of general
jurisdiction. Electoral districts for Texas district judges
consist of one or more entire counties. Eight of the districts
included in these cases include a single county; the other dis-
trict includes two counties. The number of district judges in
each district at issue varies from the 59 that sit in the Harris
County district to the 3 that sit in the Midland County dis-
trict. Each judge is elected by the voters in the district in
which he or she sits pursuant to an at-large, district-wide
electoral scheme, and must be a resident of that district. Al-
though several judicial candidates in the same district may be
running in the same election, each runs for a separately num-
bered position. Thus, for example, if there are 25 vacancies
in the Harris County district in a particular year, there are 25
district-wide races for 25 separately numbered positions. In
the primary elections, the winner must receive a majority of
votes, but in the general election, the candidate with the
highest number of votes for a particular numbered position is
elected.

---

*The counties at issue are: Harris, Dallas, Tarrant, Bexar, Travis, Jef-
ferson, Lubbock, Crosby, Ector, and Midland.

Petitioners challenged the at-large, district-wide electoral scheme as diluting the voting strength of African-American and Hispanic voters. They cited the example of Harris County, which has a population that is 20% African-American but has only 3 of 59 district judges that are African-American. The petitioners alleged that alternative electoral schemes using electoral subdistricts or modified at-large structures could remedy the dilution of minority votes in district judge elections.

Following a 1-week trial, the District Court ruled in favor of petitioners on their statutory vote dilution claim. It concluded that petitioners had sustained their burden of proving that under the totality of the circumstances "as a result of the challenged at large system [they] do not have an equal opportunity to participate in the political processes and to elect candidates of their choice," App. to Pet. for Cert. 290a–291a (footnote omitted); *id.*, at 300a–301a. Although the District Court made no findings about the appropriate remedy for the proven violation, it urged the state legislature to select and approve an alternative district judge election scheme. The District Court also announced that it would entertain motions to enjoin future district judge elections pending the remedy phase of the litigation, should the legislature fail to adopt an alternative election scheme. When the state legislature failed to act, the District Court granted interim relief (to be used solely for the 1990 election of district judges in the nine districts) that included the creation of electoral subdistricts and a prohibition against the use of partisan elections for district judges. Respondents appealed.

A three-judge panel of the Fifth Circuit reversed the judgment of the District Court, 902 F. 2d 293 (1990), and petitioners' motion for rehearing en banc was granted, 902 F. 2d 322 (1990). The en banc majority held that the results test in § 2 of the Voting Rights Act of 1965, as amended in 1982, is inapplicable to judicial elections. See 914 F. 2d 620 (1990). In essence, the majority concluded that Congress' reference to

the voters' opportunity to elect "representatives" of their choice evidenced a deliberate decision to exclude the election of judges from scrutiny under the newly enacted test. For reasons stated in our opinion in *Chisom, ante,* at 391–403, we reject that conclusion.

In a separate opinion, portions of which were joined by five other judges, Judge Higginbotham expressed his disagreement with the majority's conclusion that judges are not "representatives" within the meaning of the Act, but concurred in the judgment of reversal. His opinion relied on a distinction between state appellate judges and trial judges. Whereas the justices of the Louisiana Supreme Court have statewide jurisdiction, even though they are elected by voters in separate districts, and act as members of a collegial body, the Texas trial judge has jurisdiction that is coextensive with the geographic area from which he or she is elected and has the sole authority to render final decisions. Judge Higginbotham's opinion characterized trial judges "as single-office holders instead of members of a multi-member body," 914 F. 2d, at 649 (opinion concurring in judgment), because each exercises his or her authority independently of the other judges serving in the same area or on the same court. Given the State's "compelling interest in linking jurisdiction and elective base for judges acting alone," *id.,* at 651, and the risk that "attempting to break the linkage of jurisdiction and elective base . . . may well lessen minority influence instead of increase it," *id.,* at 649, by making only a few district court judges principally accountable to the minority electorate rather than making all of the district's judges partly accountable to minority voters, he concluded that elections for single-member offices, including elections for Texas district court judgeships, are exempt from vote dilution challenges under § 2.

Chief Judge Clark, while agreeing with the judgment of reversal on grounds "expressly limited to the facts of the present case," *id.,* at 631 (opinion concurring specially), dis-

agreed with the analysis in both the majority and the opinion concurring in the judgment. He expressed the opinion that "it is equally wrong to say that section 2 covers *all* judicial elections as it is to say it covers *none*," *id.*, at 633 (emphasis in original). Characterizing Judge Higginbotham's "function-of-the-office analysis" as "identical in concept to the majority view," *ibid.*, Chief Judge Clark would have held that whenever an officeholder's jurisdiction and the area of residence of his or her electorate coincide, no vote dilution claims may be brought against at-large schemes for electing the officeholder, regardless of whether the "function" of the officeholder is to act alone or as a member of a collegial body.

In a dissenting opinion, Judge Johnson argued that the Act applies to all judicial elections:

> "Several truths are self-evident from the clear language of the statute that had heretofore opened the electoral process to people of all colors. The Voting Rights Act focuses on the *voter*, not the elected official. The Act was intended to prohibit racial discrimination in *all* voting, the sole inquiry being whether the political processes are equally open to all persons, no matter their race or color. The Act is concerned only with the intent of persons of 'race or color' in casting a ballot; it has no interest in the function of the person holding the office." *Id.*, at 652 (emphasis in original).

## II

We granted certiorari in these cases, 498 U. S. 1060 (1991), and in *Chisom* v. *Roemer, ante,* p. 380, for the limited purpose of considering the scope of the coverage of §2. As we have held in *Chisom,* the Act does not categorically exclude judicial elections from its coverage. The term "representatives" is not a word of limitation. Nor can the protection of minority voters' unitary right to an equal opportunity "to participate in the political process and to elect representatives of their choice" be bifurcated into two kinds of claims

in judicial elections, one covered and the other beyond the reach of the Act. *Ante*, at 398. It is equally clear, in our opinion, that the coverage of the Act encompasses the election of executive officers and trial judges whose responsibilities are exercised independently in an area coextensive with the districts from which they are elected. If a State decides to elect its trial judges, as Texas did in 1861, those elections must be conducted in compliance with the Voting Rights Act.

We deliberately avoid any evaluation of the merits of the concerns expressed in Judge Higginbotham's opinion concurring in the judgment because we believe they are matters that are relevant either to an analysis of the totality of the circumstances that must be considered in an application of the results test embodied in § 2, as amended, or to a consideration of possible remedies in the event a violation is proved, but not to the threshold question of the Act's coverage. Even if we assume, *arguendo*, that the State's interest in electing judges on a district-wide basis may preclude a remedy that involves redrawing boundaries or subdividing districts, or may even preclude a finding that vote dilution has occurred under the "totality of the circumstances" in a particular case, that interest does not justify excluding elections for single-member offices from the *coverage* of the § 2 results test. Rather, such a state interest is a factor to be considered by the court in evaluating whether the evidence in a particular case supports a finding of a vote dilution *violation* in an election for a single-member office.

Thus we disagree with respondents that the "single-member office" theory automatically exempts certain elections from the coverage of § 2. Rather, we believe that the State's interest in maintaining an electoral system—in these cases, Texas' interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters—is a legitimate factor to be considered by courts among the "totality of circumstances" in determining whether a § 2 violation has occurred. A State's justification for its elec-

toral system is a proper factor for the courts to assess in a racial vote dilution inquiry, and the Fifth Circuit has expressly approved the use of this particular factor in the balance of considerations. See *Zimmer* v. *McKeithen,* 485 F. 2d 1297, 1305 (1973), aff'd *sub nom. East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1976). Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the "totality of circumstances," that interest does not automatically, and in every case, outweigh proof of racial vote dilution.

Two examples will explain why the "single-member office" theory, even if accepted, cannot suffice to place an election for a single-member-office holder entirely beyond the coverage of § 2 of the Act. First, if a particular practice or procedure, such as closing the polls at noon, results in an abridgment of a racial minority's opportunity to vote and to elect representatives of their choice, the Act would unquestionably apply to restrict such practices, regardless of whether the election was for a single-member-office holder or not. Exempting elections for single-member offices from the reach of § 2 altogether can therefore not be supported. As we stated earlier, this statute does not separate vote dilution challenges from other challenges brought under the amended § 2. See *supra,* at 425–426.

Second, if the boundaries of the electoral district—and perhaps of its neighboring district as well—were shaped in "an uncouth twenty-eight-sided figure" such as that found in *Gomillion* v. *Lightfoot,* 364 U. S. 339, 340 (1960), and if the effect of the configuration were to produce an unnatural distribution of the voting power of different racial groups, an inquiry into the totality of circumstances would at least arguably be required to determine whether or not the results test was violated. Placing elections for single-member offices entirely beyond the scope of coverage of § 2 would preclude such an inquiry, even if the State's interest in maintaining

the "uncouth" electoral system was trivial or illusory and even if any resulting impairment of a minority group's voting strength could be remedied without significantly impairing the State's interest in electing judges on a district-wide basis.

Because the results test in § 2 of the Voting Rights Act applies to claims of vote dilution in judicial elections, see *Chisom, ante,* at 404, and because the concerns expressed by Judge Higginbotham in distinguishing elections of Texas district court judges from elections of supreme court justices relate to the question whether a vote dilution violation may be found or remedied rather than whether such a challenge may be brought, we reverse the judgment of the Court of Appeals and remand these cases for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

For the reasons stated in my opinion in *Chisom* v. *Roemer, ante,* p. 404, I would not apply § 2 of the Voting Rights Act of 1965 to vote dilution claims in judicial elections, and would therefore affirm the judgment below.