836 F.Supp. 453 (1993)
RURAL WEST TENNESSEE AFRICAN-AMERICAN AFFAIRS COUNCIL, INC., Minnie Bommer, Jean Carney, Dr. C.T. Boyd, Brenda Woods, Shirley Kee, Anna Faye Moore, Rev. William Smart and Dr. Warren Dickerson, Plaintiffs,
v.
Ned McWHERTER, in his official capacity as Governor of the State of Tennessee, John Wilder, in his official capacity as Lieutenant Governor and Speaker of the Tennessee Senate, James Naifeh, in his official capacity as Speaker of the Tennessee House of Representatives, Will Burns, in his official capacity as Coordinator of Elections, and Lenita McGraw, Janet Black, Judy Bishop, Ella Mae Esque, Spence Dupree, Bobby White, and Linda Burnett, in their official capacities as Registrars of Fayette, Hardeman, Haywood, Lauderdale, Madison, Shelby and Tipton Counties, Defendants.
Civ. A. No. 92-2407.
United States District Court, W.D. Tennessee, W.D.
November 4, 1993.
*454 Bruce S. Kramer (ACLU), Borod & Kramer, Memphis, TN, Richard Dinkins (ACLU), Williams and Dinkins, Nashville, TN, Kathleen Wilde (ACLU), American Civ. Liberties Union, Atlanta, GA, Keenan R. Keller (ACLU), Davis, Polk & Wardwell, New York City, Richard Fields (NAACP-Intervenor), Memphis, TN, for plaintiffs.
Charles W. Burson, Atty. Gen. and Reporter, Michael W. Catalano, Deputy Atty. Gen., John H. Reinbold, Asst. Atty. Gen., Nashville, TN, for defendants.
Before: MERRITT, Chief Circuit Judge, BROWN, Senior Circuit Judge, and TURNER, District Judge.

OPINION
This is a civil rights case brought under § 2 of the Voting Rights Act, 42 U.S.C. § 1973,[1] and several constitutional provisions. *455 The action challenges Tennessee's 1992 apportionment of its 33 state Senate districts.[2] Tennessee's voting age population is 14.4% black, but in only three of the districts (9.1%) do blacks have a reasonable chance to elect a black-preferred candidate as a state senator. We do not reach the constitutional questions because we find that the plan violates § 2 by affording black voters in west Tennessee less opportunity than other members of the electorate to elect representatives of their choice. The legislature must revise its apportionment of the state senate to provide four majority black districts in order to comply with § 2.

I.
The Tennessee General Assembly consists of a thirty-three member Senate and a ninety-nine member House of Representatives. The state Senate is elected from single-member districts of roughly equal population. Under the 1992 reapportionment plan, three of the thirty-three Senate districts contain a majority-black population. Two of the three majority-black Senate districts are in Shelby County in southwest Tennessee, the third is in the middle of the state in Nashville, Davidson County.
Plaintiffs challenge the effect of the 1992 plan on the voting strength of blacks living in west Tennessee. The evidence presented at trial relates primarily to seven west Tennessee counties: Shelby County (which includes the city of Memphis), and six predominantly rural counties, Tipton, Lauderdale, Haywood, Madison, Fayette, and Hardeman. Plaintiffs contend that black voters in Shelby County are unnecessarily "packed" into the two majority-black districts and that three majority-black districts could easily be created in Shelby County. They also allege that by splitting concentrations of black population in the rural counties into different Senate districts, the 1992 plan dilutes black voting strength.
Under the 1992 plan, there are five Senate districts contained wholly within Shelby County, Districts 28, 29, 30, 31, and 33. Senate District 32 contains part of Shelby County and all of Lauderdale and Tipton Counties. Plaintiffs contend that the two majority-black districts, districts 29 and 33, are "packed" with an excessive number of black voters. District 29 has an 83% black voting-age population, and District 33 has a 69% black voting-age population. Districts 28 and 30 have black voting-age populations of 31% and 33%, respectively. Plaintiffs have shown that it is possible to redraw these districts so that there are three majority-black Senate districts in Shelby County instead of two. These proposed districts would have black voting-age populations of 60.9%, 60.9%, and 60.0%.
Under the 1992 plan, the six rural counties at issue in this case form parts of three Senate districts, Districts 26, 27, and 32. Plaintiffs contend that the present configuration of these districts unnecessarily fragments concentrations of black population. Districts 26 and 27 both have black voting-age populations of 21%, and District 32, which contains part of Shelby County, has a black voting-age population of 17%. Plaintiffs have shown that by including part of Shelby County it is possible to draw a district in rural west Tennessee with a black voting-age population of more than 55%. Plaintiffs first proposed a rural Senate district which would split the six rural counties and Shelby County. Plaintiffs have shown, however, that it is possible to draw a Senate district with a greater than 55% black voting-age population by splitting only Shelby and Madison counties and by including all of rural *456 Haywood, Fayette, and Hardeman counties.[3]

II.
Plaintiffs allege that by failing to create three majority-black Senate districts in Shelby County and one majority-black Senate district in rural west Tennessee, the State has violated § 2 of the Voting Rights Act by diluting the voting strength of black voters in Tennessee.
The Voting Rights Act was passed in 1965, and was amended in 1982. The purpose of the 1982 amendment was to "make clear that plaintiffs need not prove a discriminatory purpose in order to establish a violation." Chisom v. Roemer, ___ U.S. ___, ___ n. 21, 111 S.Ct. 2354, 2363 n. 21, 115 L.Ed.2d 348 (1991) (quoting S.Rep. No. 417, 97th Cong., 2d Sess. 2, reprinted in 1982 U.S.C.C.A.N. 177 [hereinafter Senate Report]). The statute thus sets out a "results test." Thornburg v. Gingles, 478 U.S. 30, 44 n. 8, 106 S.Ct. 2752, 2763 n. 8, 92 L.Ed.2d 25 (1986). A voting procedure violates the Act in this case if it has the "result" under the "totality of the circumstances" of affording black voters less opportunity than white voters "to elect representatives of their choice." 42 U.S.C. § 1973(b).
The Senate Judiciary Report on the 1982 amendment sets out some of the relevant factors to be considered under the totality of the circumstances.[4] The Supreme Court first addressed the 1982 amendment in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In Gingles, the Court explained the statutory "totality of the circumstances" test and set out the three "necessary preconditions" of a successful § 2 claim, only the last of which is in dispute in this case:
1. The plaintiffs must demonstrate that the protected group is sufficiently large and geographically compact that it could constitute an effective majority in a single-member district.
2. The plaintiffs must show that the protected group is politically cohesive.
3. The plaintiffs must show that the majority votes sufficiently as a bloc to enable it usually to defeat the protected group's preferred candidate.
Id. at 50-51, 106 S.Ct. at 2766-2767. Although Gingles involved a challenge to multi-member districts, the three Gingles elements of a § 2 cause of action apply to challenges to *457 single-member systems as well. Growe v. Emison, 507 U.S. ___, ___, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993); Voinovich v. Quilter, ___ U.S. ___, ___, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993). Once the elements have been established, plaintiffs must still show that under the totality of the circumstances a violation has occurred. See Jeffers v. Clinton, 730 F.Supp. 196, 209 (E.D.Ark.1989).
Plaintiffs, as noted, have submitted two different districting plans which would provide two more Senate districts in west Tennessee with black voting-age populations of greater than 55%. Either of plaintiffs' suggestions satisfies the first element of Gingles. The second Gingles precondition is that the minority community be politically cohesive. Gingles, 478 U.S. at 51, 106 S.Ct. at 2766. This is a question of whether black voters in west Tennessee share a community of interests and tend to vote differently from the majority white population. The parties have stipulated that the African-American communities of rural southwest Tennessee and Shelby County are politically cohesive.
The main dispute in this case concerns the third Gingles factor: whether the white majority votes sufficiently as a bloc to enable it usually to defeat the black minority's preferred candidate. The focus of the dispute is the definition of "preferred candidate." Plaintiffs contend that when there is no black candidate in a race there is no way to be sure that the candidate who receives the most black votes is the "true" candidate of choice and not simply the "lesser of two evils." They therefore rely solely upon West Tennessee state legislative elections in which there is at least one black and one white candidate.[5] The State relies instead upon all West Tennessee state legislative elections since 1986 for which election data is available, regardless of whether there is a black candidate in the race. The State concedes that "black-white" elections are more relevant to our inquiry than are "white-white" elections, but proposes to control for the difference by weighing elections based upon black voter turnout. It argues that if blacks do not have a strong preference in a white-white election, black voter turnout should be expected to drop and the election should be given correspondingly less weight.
Under plaintiffs' analysis it is clear that white bloc voting usually works to defeat the black preferred candidate in white majority districts. Plaintiffs' expert, Stephen Cole, analyzed seven state legislative elections in rural west Tennessee and eight in Shelby County. In six of the seven rural county elections there was voter polarization based upon race, and in five of the elections the level of polarization was overwhelming. White support of black candidates was particularly low, with only one black candidate receiving more than 10% of the white vote. No black candidate won any of the state legislative elections held in rural west Tennessee.
Black candidates in Shelby County were more successful, winning four of the eight recent black-white contests for state legislative office. Blacks were able to win, however, only in majority-black districts, and in only one election did a black candidate win even a bare majority of the white vote. The overall level of racially polarized voting in Shelby County is comparable to that in the rural counties. To give some idea of the level of white bloc voting in west Tennessee it is interesting to compare the fifteen black-white elections in this case to the thirty-seven black-white elections considered in Gingles. In the North Carolina state legislative races analyzed in Gingles, black candidates received an average of 31.62% of the *458 white vote. In the fifteen elections analyzed by the plaintiffs in this case, black candidates received an average of only 9.07% of the white vote. Based solely upon the black-white state legislative elections in west Tennessee, then, we find a high level of white bloc voting which usually enables the majority to defeat the black community's candidate of choice.
The State's analysis of black voter turnout does not significantly affect this conclusion. The State's expert witnesses, Michael M. Gant and William Lyons, proposed to measure the importance of white-white elections to black voters by comparing black voter turnout in white-white elections to turnout in black-white elections. They looked at all elections in which black voters and white voters preferred different candidates and in which the voting-age population was between 25% and 50% black. The State's rationale for limiting the analysis to elections in districts with a 25% to 50% black voting-age population was that (1) in districts with a voting-age population less than 25% black, the chance of a black candidate succeeding is so low that black turnout may suffer for reasons unrelated to the race of the candidates; and (2) in districts with a voting-age population greater than 50% black the black-preferred candidate is virtually assured victory. In the nineteen elections which met the State's criteria, black turnout was 24% in white-white elections and 28% in black-white elections. The State therefore concludes that black voters are almost as interested in white-white elections as in black-white elections, and so white-white elections should be given almost as much weight under the third Gingles factor as black-white elections.
While we agree with the State that black voter turnout is relevant to the question whether the black-preferred candidate in a white-white election is the "true" candidate of choice of the black community, we do not think it is the only, or even most important, consideration. First, voter turnout in state legislative elections is influenced primarily by the nature of other elections taking place at the same time and secondarily by the weather. See Rainbow Coalition of Oklahoma v. Oklahoma State Election Board, 844 F.2d 740, 742 (10th Cir.1988) (stating that it is "undisputed" that in Oklahoma, where gubernatorial and presidential elections alternate every two years, voter turnout is consistently higher during presidential elections); Burnham, The Turnout Problem, in Elections American Style 97, 113-14 (A.J. Reichley ed. 1987) (noting that voter turnout increases during presidential election years); Briffault, Our Localism: Part II  Localism and Legal Theory, 90 Colum.L.Rev. 346, 397-98 (1990) (same); Sam Howe Verhovek, New York Democrats' Hopes Tied to Clinton Coattail Effect, N.Y.Times, Nov. 3, 1992, at A1 (calling weather conditions "[o]ne of the classic vagaries behind voting patterns"). Second, to the extent voter turnout is affected by local elections, black voter turnout measures only the general level of interest in the election outcome, not necessarily the absolute level of support in the black community for the black-preferred candidate. For instance, in some white-white elections, blacks may turn out in high numbers to defeat a particularly disfavored candidate. We therefore reject the State's contention that white-white elections are almost as relevant to our inquiry as are black-white elections.
Other district courts in the Sixth Circuit have also taken the position that black-white elections should be given more weight than white-white elections. In Buchanan v. City of Jackson, 683 F.Supp. 1515, 1529 (W.D.Tenn.1988), the court held that "the court may consider all elections in determining whether members of a minority have less opportunity than other members of the electorate to elect representatives of their choice ... That is not to say, however, that all elections must be given equal weight." The court concluded that "elections in which there was a black candidate are more probative." Id. at 1531. See also Mallory v. Eyrich, 707 F.Supp. 947, 952 (S.D.Ohio 1989). Although the plurality opinion in Gingles states that "it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important," 478 U.S. at 68, 106 S.Ct. at 2775, the Gingles Court upheld a decision based solely upon an analysis of black-white elections. See id. at 80-82, 106 S.Ct. at 2781-2783; see also, Citizens for a Better *459 Gretna v. City of Gretna, 834 F.2d 496, 503-04 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) (noting that no Justice in Gingles considered "evidence of elections in which only whites were candidates"); Campos v. City of Baytown, 840 F.2d 1240, 1245 (5th Cir.1988) ("Gingles itself looked only to elections where Black candidates were running."). The Gingles Court also stated that in determining the appropriate number of elections to study when analyzing racially polarized voting, "[o]ne important circumstance is the number of elections in which the minority group has sponsored candidates." Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769.
The weight to be given to white-white elections is best determined on a case-by-case basis. See City of Jackson, 683 F.Supp. at 1531 (relying upon "elections analyzed in this case and the circumstances surrounding those elections" to determine that races involving black candidates were more probative). The facts of this case persuade us that we should rely primarily upon the black-white elections. The evidence showed that one reason many elections did not involve a black candidate is that black candidates are discouraged from running in majority-white districts. Several plaintiffs, members of the Rural West Tennessee African-American Affairs Committee and black community leaders, testified that they have tried to recruit qualified blacks to run for elective office and found it difficult. This testimony was corroborated by the findings of one of plaintiffs' expert witnesses, Richard Couto. One reason blacks are discouraged from running is that they often see a black candidacy in a majority-white district as a futile gesture. There is a perception in the black community that black candidates cannot expect to receive much white support in the form of votes or fundraising.
Historical discrimination against blacks in west Tennessee has also contributed to the perceived futility of black candidacies in majority-white districts. Plaintiffs presented proof that blacks in west Tennessee have about half the per capita income of whites and three times the level of poverty. Lower economic status inhibits the ability of potential black candidates to raise funds in the black community. Historical black political disenfranchisement also limits potential black electoral success. Perhaps most important of all, because black candidates have not been elected in the past, they are not now in a position to enjoy the benefits of incumbency and political sponsorship which come with being part of the political mainstream. It would not make sense to allow data from white-white elections in majority-white districts, in which potential black candidates viewed black candidacies as futile, to overcome evidence of white bloc voting in black-white elections in districts in which black candidates felt they stood a fighting chance.
We are inclined to give less weight to white-white elections in which black and white voters preferred the same candidate because many of those contests were landslides in which a strong incumbent faced only token opposition. Gingles recognizes the legitimacy of such considerations: "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it  in the absence of special circumstances, such as the minority candidate running unopposed, ... usually to defeat the minority's preferred candidate." Gingles, 478 U.S. at 51, 106 S.Ct. at 2766 (emphasis added, citation omitted). "Special circumstances include `the absence of an opponent, incumbency, or the utilization of bullet voting.'" Id. at 57, 106 S.Ct. at 2769 (emphasis added). Of the twenty-seven non-polarized elections analyzed by the State, the average margin of victory of the winning candidate was 41.23%. In fourteen of the elections, over half, the winning candidate received more than 70% of the total vote. These statistics indicate to this Court that black voters and white voters often prefer the same candidate because there is only one viable candidate.
We also are unimpressed by the State's demonstration that, of the thirty-two state legislative contests in which voting was racially polarized, the black-preferred candidate won fourteen, almost half. The character of the elections in which black-preferred candidates defeat white-preferred candidates is very different from those in which whitepreferred *460 candidates defeat black-preferred candidates. In white-white elections in which black-preferred candidates prevail against white voter opposition, the black vote acts as a decisive swing vote in elections over which the white community is closely split. We have no evidence whether any candidates in white-white elections were sponsored by the black community. See also, Westwego Citizens v. City of West Wago, 946 F.2d 1109, 1119-20 n. 15 (5th Cir.1991) (concluding that black support for white candidates in an all white field tells little about white bloc voting). Like the court in Jeffers, we recognize that the power to influence close elections between white candidates is an important aspect of political power, but the principle seems to be that in majority-white districts, "candidates favored by blacks can win, but only if the candidates are white." Jeffers v. Clinton, 730 F.Supp. 196, 209 (E.D.Ark.1989) (quoting Smith v. Clinton, 687 F.Supp. 1310, 1318 (E.D.Ark.1988)). Racially polarized black-white elections are of a different character. In these elections the black-preferred candidate receives strong black support, 86.30% on the average, but this vote is overwhelmed by white bloc voting averaging more than 90%.
Based upon all of the evidence we find that in Tennessee black-white elections are more probative of racial bloc voting than are white-white elections, and that the black-white elections indicate white bloc voting which usually enables the majority to defeat the black community's candidate of choice. All three of the Gingles preconditions have therefore been met. We next move to a consideration of the "totality of the circumstances."

III.
Section 2 of the Voting Rights Act requires us to examine the "totality of the circumstances" to determine whether the challenged electoral practice, the 1992 redistricting plan, gives west Tennessee black voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." We begin with the list of factors set out in the Senate Report on the 1982 amendment. See supra, note 3. We have already addressed the second listed Senate factor, racially polarized voting, and have found strong evidence of polarization, especially in black-white elections. Under the third Senate factor (leaving aside the challenged redistricting plan) we find no evidence of discriminatory voting practices or procedures  such as "unusually large election districts, majority vote requirements, anti-single shot provisions"  in recent state legislative elections. There is also no evidence of a discriminatory slating process, the fourth Senate factor. Candidates for state legislative offices are selected through an open primary system.
We now turn to the Senate factors that warrant greater attention.

A. History of Official Discrimination in Voting.
There is no doubt that Tennessee has a long history of official racial discrimination in voting. Although the worst discrimination is in the past, effects of past discrimination are still apparent and there remains some evidence of official discrimination in the last 15 years.
The history of official discrimination against blacks in Tennessee begins, of course, with the officially sanctioned institution of slavery prior to the Civil War. Despite the existence of slavery, free black men could and did vote in Tennessee until 1834, when the Tennessee Constitution was changed to deny the vote to all blacks. In 1867, during Reconstruction, suffrage was extended once again to black males, and black candidates enjoyed some electoral success. With the end of Reconstruction, however, and the beginning of the Jim Crow era, black citizens were once again effectively disenfranchised. In 1889 and 1890 the state legislature passed voting regulations requiring voter registration; separate ballot boxes for local, state and national elections; single, non-partisan ballots; and a poll tax. These laws had the primary purpose and effect of reducing black political participation.
More recently, the political gains by black citizens during the civil rights movement of the 1950's and 60's were accompanied by increased official discrimination in voting. Government officials manipulated voter registration *461 requirements to discourage black voters, and supported or initiated physical and economic intimidation of those blacks who did manage to register. The strongest example of economic intimidation was the eviction of more than 400 black sharecropping families, most of them in Fayette County, after the 1960 election. These evictions were made possible by registrars who would inform sheriffs of the names of blacks who had registered to vote; the sheriffs would then inform white landowners who would evict black tenants who had registered. These mass evictions led to the formation of two "tent cities" for displaced sharecroppers, one in Fayette County and one in Haywood County. The tent cities became national symbols of the struggle of west Tennessee blacks for equal access to the polls.
Although overt official discrimination against black voters has declined significantly since the 1960's, at least one federal court has found evidence of intentional discrimination against black candidates and voters in west Tennessee. In Taylor v. Haywood County, 544 F.Supp. 1122 (W.D.Tenn.1982), the district court enjoined Haywood County from changing its Board of Highway Commissioners election system from district elections to a countywide at-large election. The court found that the change in the number of districts from 10 to 9, which necessitated the change to an at-large election scheme, was "a result of the purposeful intention to dilute black voting strength in Haywood County, Tennessee." Id. at 1131. In Hardeman County in 1983 a lawsuit was filed against the City of Bolivar challenging an amendment to the City Charter providing for a mayoral runoff election if no mayoral candidate received a majority of the votes. Bills v. Alexander, Civ.Act. No. 83-1220 (W.D.Tenn.). The plaintiffs alleged that the City had amended its Charter in response to the success of two black candidates for mayor in 1981. The district court approved a class action settlement setting up a new "system which will ensure the opportunity of black citizens of Bolivar to meaningfully participate in the political process." These cases challenging newly adopted election systems indicate to the court that official discrimination against blacks in voting is not entirely a thing of the past in west Tennessee.
The State acknowledges Tennessee's history of officially sanctioned racial discrimination in voting and the judicial findings of discriminatory practices in local and county elections. The State argues, however, that these facts are not particularly relevant to present-day state legislative elections. We reject this conclusion for two reasons. First, past discrimination, especially that which took place during the civil rights movement, affects present-day politics. It has had a psychological effect upon black citizens who lived through it, creating in some a lingering sense of disillusionment, frustration, and mistrust. That government officials acted to prevent blacks from fully participating in the electoral process in the 1950s and 60s also means that today there are few entrenched and powerful black elected officials from that era. There is no tradition of black electoral success. Second, city and county elective offices are often stepping stones to seats in the General Assembly. Success in these elections can provide experience, credibility, and a political powerbase to potential candidates for the state legislature.
There is no evidence that the defendants, Governor McWherter, Lieutenant-Governor Wilder, Speaker Naifeh, State Election Coordinator Burns, or the county Registrars-at-large, have engaged in any intentional discrimination against black voters. In fact, the testimony of several of the defendants demonstrated sensitivity to the needs of black voters. Nevertheless, we find that in west Tennessee there is a history of official discrimination against blacks in voting which has present-day effects, and that official discrimination in voting is not entirely in the past. Official discrimination, past and present, can increase the effect of vote-diluting district lines.

B. Effects of Discrimination in Such Areas as Education, Employment, and Health.
In west Tennessee, black citizens are more likely than white citizens to live in poverty, to be unemployed, and to live in substandard housing. Black citizens are less likely to have completed high school, to own their own *462 homes, to have access to a car, or to have telephones in their homes. As the Senate Report recognizes, educational and economic disadvantages can translate into political disadvantage.

C. Racial Appeals in Campaigns.
Plaintiffs presented little evidence of overt racial appeals in campaigns. Their expert witness, Richard Couto, concluded that "[r]acial harangues are unnecessary when there is white hegemony." Plaintiffs placed more emphasis upon the reluctance of white citizens to publicly support black candidacies because of fear of retaliation. There was credible testimony that white supporters of black candidates are often unwilling to display bumper-stickers or yard signs or to otherwise publicly announce their support. Overall, though, the evidence does not support a conclusion that white candidates for elective office in west Tennessee have overtly acted to make race a campaign issue.

D. Electoral Success of Black Candidates.
Section 2 of the Voting Rights Act states that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" under the "totality of the circumstances." 42 U.S.C. § 1973(b). The Senate Report also lists minority electoral success as a "relevant factor." Senate Report at 29. The statute states further that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Nevertheless, based upon the evidence presented at trial, we find that the lack of black electoral success in Tennessee is a factor which weighs in favor of a finding of vote dilution.
The State argues that we should confine our analysis of black electoral success to the region of the state at issue, west Tennessee. We agree instead with the plaintiffs' position that the proper scope of our review is the entire state. Although plaintiffs have challenged only the effect of the 1992 redistricting plan upon west Tennessee, what is really at issue is the entire plan. This conclusion is mandated by the language of the statute itself: "The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered." 42 U.S.C. § 1973(b) (emphasis added).
The statutory authority to consider minority electoral success pertains to the issue of whether the minority within the applicable jurisdiction, in this case the state, suffers from vote dilution. If black electoral success statewide was sufficient to elect more black candidates percentage-wise than their population in the state, it would be difficult, if not impossible, to conclude that the district lines resulted in minority vote dilution in violation of § 2.
We agree with the State, however, that the statute uses the word "electorate" and that we should measure the proportionality of black representation on the basis of black voting age population (the "electorate") rather than total black population. Blacks represent a higher percentage of the total population than of the voting-age population. The plaintiffs urge that the language of the 1982 amendment to the Act  "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," id. (emphasis added)  supports a conclusion that total population should be used. Plaintiff's also point to the statement in the Senate Report that "[t]he principle that the right to vote is denied or abridged by dilution of voting strength derives from the one person, one vote reapportionment case of Reynolds v. Sims." Senate Report at 19. Reynolds noted that "one person" does not mean "one voter," it means one member of the population. Reynolds v. Sims, 377 U.S. 533, 560-561, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). Reynolds, however, is concerned with ensuring that each district incorporates the same number of people so that the voting strength of an individual does not vary by virtue of the location of his or her residence. The language quoted from Reynolds is not related to the redrawing of district lines on the basis of demographic factors and thus is not relevant in this case. See Beer v. United States, 425 U.S. 130, 142, n. 14, 96 S.Ct. 1357, 1364 n. 14, 47 L.Ed.2d 629 (stating that "the many cases ... involving the Fourteenth *463 Amendment's one man, one vote standard are not relevant in a case involving redistricting"). The goal of § 2 of the Act is to protect the voting strength of minority groups, which is more accurately reflected by voting-age population than by total population. The Supreme Court has noted the prevalence of this standard with approval. See, e.g., Growe v. Emison, 507 U.S. ___, ___, 113 S.Ct. 1075, 1079, 122 L.Ed.2d 388, U.S. Lexis 1780 (1993) at 25 (noting that "to establish whether a § 2 violation has occurred ... courts have looked to, not the district's total minority population, but the district's minority population of voting age" and citing Romero v. Pomona, 883 F.2d 1418, 1425-1426, and n. 13 (9th Cir.1989) (citing cases) and Gingles 478 U.S. at 48, 50, 106 S.Ct. at 2765, 2766).
The voting-age population in Tennessee is 14.4% black. The General Assembly's 1992 reapportionment plan has the same number of majority-black districts as did the previous plan, three out of thirty-three. It has been demonstrated that black candidates cannot expect to succeed in majority-white districts. To our knowledge, no black from a majority-white district has won a seat in the state Senate this century. Under the new plan, then, blacks can expect to hold 9.1% of the Senate seats, the same percentage blacks now hold. Four majority-black districts would be 12.1% of the Senate districts, slightly below the voting-age population of 14.4%; five of thirty-three districts would be 15.2%, slightly above the black voting-age population. We recognize that the level of black electoral success is merely a factor to be considered, and that blacks are not guaranteed proportional representation by § 2. With this caveat in mind, we find that the level of black electoral success in the state Senate indicates that the Senate reapportionment plan will result in minority vote dilution.

E. Responsiveness of Elected Officials.
Plaintiffs have disavowed any attempt to prove that state elected officials are unresponsive to their black constituents. Plaintiffs filed a motion in limine to preclude the defendants from offering testimony on the responsiveness of elected officials. We declined to forbid all such testimony, holding that responsiveness is relevant to intent under plaintiffs' constitutional claims, and relevant to the § 2 claim under the "totality of the circumstances." We did, however, limit evidence to the responsiveness of the General Assembly as a whole, rather than the responsiveness of individual legislators, because the actions of particular officeholders are not at issue.
The State presented evidence that the General Assembly is responsive to the black community in west Tennessee. White legislators with large black constituencies campaign hard in the black community, are often endorsed by black organizations, and often receive strong black support at election time. Lieutenant-Governor Wilder,[6] state Senator from District 26 and Speaker of the Senate, provided a long list of measures passed by the General Assembly aimed primarily at helping the black community. On the other hand, some of the plaintiffs, citing specific examples of neglect, testified they did not feel that the General Assembly is as responsive to black citizens as to white citizens.
There is some merit to both sides of this dispute. In the political process it is impossible to please everyone; from time to time interest groups and constituencies will feel slighted despite what legislators feel are their best efforts to be fair to everyone. See Jeffers, 730 F.Supp. at 213 ("There is bound to be some public dissatisfaction, among blacks as well as whites, with almost any office holder[.]"). Such differences of opinion are difficult for this Court to resolve. The House Report on the 1982 amendment recognized this problem when it praised the amendment for avoiding "highly subjective factors such [as] responsiveness of elected officials to the minority community." Senate Report at 27, 24 (quoting H.Rep. No. 97-227, 97th Cong., 1st Sess., at 30). Although we believe that under the totality of the circumstances the legislature's responsiveness to *464 the black community may be considered, the evidence before us is equivocal. We do not, therefore, place much weight upon this factor.

F. State Policy Underlying Redistricting Plan.
An "additional factor[] that in some cases ha[s] had probative value as part of plaintiffs' evidence to establish a violation" is "whether the policy underlying the state or political subdivision's use of [the challenged voting procedure] is tenuous." Senate Report at 29. The primary policy asserted by the state in retaining the present reapportionment plan is the state's constitutional policy of preserving the integrity of county lines. The Tennessee Constitution, Article II, Section 6, provides that, in apportioning Senate districts, "no county shall be divided in forming such a district."[7] A federal district court has already recognized that Tennessee's policy of preserving county lines is far from "tenuous." In Murray v. Crowell, No. 84-0566 (M.D.Tenn.1985), the court found a number of justifications for the policy: (1) it inhibits political gerrymandering; (2) it reduces voter confusion; (3) it makes representatives more accountable to citizens of a county as a group; (4) it reduces the costs of holding elections and running for office; (5) it provides bright-line clarity to reapportionment law; (6) it enhances the representation of county governments in the state legislature; and (7) it encourages voter participation.
The Supreme Court has indicated that, not only must a court determine that the state's interest in a challenged voting procedure is not "tenuous," it must also consider whether the state's interest is compelling. In Houston Lawyers' Ass'n v. Attorney General of Texas, ___ U.S. ___, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), the Court stated that "the State's interest in maintaining an electoral system ... is a legitimate factor to be considered among the `totality of the circumstances' in determining whether a § 2 violation has occurred." Id. at ___, 111 S.Ct. at 2381. Since Houston Lawyers, a number of district courts have examined the state's interest in its electoral system under the totality of the circumstances. See Nipper v. Chiles, 795 F.Supp. 1525, 1532 (M.D.Fla.1992); Magnolia Bar Ass'n. v. Lee, 793 F.Supp. 1386, 1412 (S.D.Miss.1992); Southern Christian Leadership Conf. v. Evans, 785 F.Supp. 1469, 1478-80 (M.D.Ala.1992); Clark v. Roemer, 777 F.Supp. 471, 479 (M.D.La.1991).
There are some practical problems with weighing state interests under the totality of the circumstances test. First, § 2 is concerned with "results," specifically the ability of minority groups to elect representatives of their choice. See Gingles, 478 U.S. at 44 and n. 8, 106 S.Ct. at 2762 and n. 8, (stating that the Senate Report makes clear that § 2 imposes a "results test"). Consideration of a state's interests in adopting a challenged electoral system is more appropriate under the "intent" test rejected by Congress. Id. (citing Senate Report). As the Fifth Circuit observed:
Because the state interests would not be a signal of dilution like the other Section 2 factors (including the tenuousness of the state interests), a court analyzing a Section 2 claim under the proposed balancing framework would no longer ask only whether, under the totality of the circumstances, there is an unequal opportunity to participate in the political process. The court would also ask whether, in light of the state interests, the unequal opportunity to participate is sufficiently unequal to support a finding of liability under Section 2. In other words, the state interests would have to be weighed against proven vote dilution. The problem with such a framework, from a district court's perspective, is the lack of standards for such an approach.
League of United Latin American Citizens v. Clements, 986 F.2d 728, 763 (5th Cir.1993), on remand from Houston Lawyers, ___ U.S. ___, 111 S.Ct. 2376, 115 L.Ed.2d 379 (citations omitted).
The second practical problem is that the state's interests in an electoral scheme *465 are only relevant to the extent that those interests are compromised by a possible § 2 remedy. See id. at 763-64. When potential remedies do not impinge on the state's interests those interests need not be considered. We have before us only two of the numerous possible remedies, both of which were presented by the plaintiffs. The first plan was presented primarily to demonstrate that the first Gingles precondition can be met. The second plan was submitted in response to concerns expressed by the court and the State that plaintiffs' plan ignored "traditional districting principles." Shaw v. Reno, ___ U.S. ___, ___, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993). Specifically, one of the proposed majority-black districts split six counties. Plaintiffs' second plan demonstrated that a second district could be created by splitting only Shelby and Madison Counties. Under the current plan, some counties are split in forming Senate districts, but no district splits more than one county.

G. "Influence" Districts vs. Majority-Minority Districts.
The State mounts a strong additional argument under § 2 of the Voting Rights Act that, although the creation of one or more majority black districts in west Tennessee would likely increase the number of black state senators, such a change may well reduce the overall influence of black voters in the State Senate. The State's argument is that it is better under § 2 for minority voters to have their influence spread widely than to be able to control a few districts.
Senator Steve Cohen, a white state senator from Memphis whose district would become majority black under the plaintiffs' redistricting proposal, testified that the actual influence of black voters would be reduced because the black voters in one or more adjacent majority white districts would have to be removed and placed in his district, thereby reducing the broader influence of black voters in several districts. He gave as an example of the reduced influence the legislative proposal to make the birthday of Martin Luther King a state holiday, a bill which passed in the State Senate by only one vote (17 to 16). Senator Cohen voted for the bill, and another white Senator in an adjacent Shelby County district also voted for the bill. The thrust of Senator Cohen's testimony was that by removing black votes from the adjacent majority white district in order to make a black majority district, at least one more conservative white Senator would probably be elected, a Senator who would be uninfluenced by black voters and would have been inclined to vote against the King birthday bill, a symbolic measure strongly favored by black voters but opposed by many white voters in west Tennessee.
Conceptually it may be true, at least in some instances, that black influence in the legislative process on a statewide basis could be reduced by the creation of one or more additional majority black districts. Black voters may join like-minded white voters to elect a white representative favorable to black interests. By spreading the black vote out in several districts, the influence of black voters, but not their visible black representation, may be enhanced.
The § 2 legal question which underlies this debate is this: When a choice is between two or more black "influence" districts, most likely represented by whites, versus one majority black district represented by a black, what does § 2 require in geographical areas of racially polarized block voting with a history of prior racial discrimination? Although this question of interpretation is latent in several voting rights cases, the courts have not expressly decided it. In Jeffers v. Clinton, 730 F.Supp. 196 (E.D.Ark.1989), where this question was just below the surface, the opinion by Judge Richard Arnold ordered the creation of additional majority black districts, holding by implication that visible black representation should trump black influence districts in the circumstances of that case. In Voinovich v. Quilter, ___ U.S. ___, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the Supreme Court alluded to the question but did not reach it because the district court had found that voting was not racially polarized.[8] Even *466 so, in Voinovich the Court allowed an Ohio legislative apportionment plan which packed a super majority of black voters into districts in order to create visible black representation. Some political scientists have referred to this practice as "political ghettoization," in which "black voters are concentrated in a handful of majority-black districts, with little or no influence in the remaining districts." Grofman & Davidson, Postscript: What Is the Best Route to a Color-Blind Society in Controversies in Minority Voting: The Voting Rights Act in Perspective, 300, 312 (1992).
The Supreme Court has made racially polarized block voting in areas where a majority-minority district is possible the central focus of § 2 jurisprudence. In Gingles this method of framing the issue suggests strongly that the creation of majority black districts is the normal remedy for a § 2 violation. This focus led Justice O'Connor in her concurring opinion in Gingles to ask: "Is the `voting strength' of a racial group to be assessed solely with reference to its prospects for electoral success, or should courts look at other avenues of political influence open to the racial group?" 478 U.S. at 88, 106 S.Ct. at 2785.
Section 2 seems to answer this question. Whatever may be the wisdom of the Congressional policy, it appears that the language of § 2 and its legislative purposes strongly favor the creation of majority black districts and visible black representation, instead of "influence" districts, when block voting is racially polarized and there is a history of racial discrimination. The language of the statute creates a "results" test and states that districts should be created in which racial minorities have an "opportunity ... to elect representatives of their choice." The evidence in the present case, as in many cases, shows that blacks prefer to elect black representatives when they have a choice. The Senate report explaining the language of § 2 says "the presence of minority elected officials is a recognized indicator of access" to the political process under the "results" test. Senate Report at 193. It also says that "the extent to which members of the minority group have been elected to public office in the jurisdiction" in question is a major factor in determining a violation of § 2. Senate report at 206-7. In light of this language, it appears that § 2 opts in favor of visible black representation over other forms of political influence when racial block voting and a history of prior racial discrimination are present, as here. In such instances, § 2 as we interpret it opts for black control of some districts rather than spreading out black "influence" in more districts likely to be represented by white elected officials.

H. Totality of the Circumstances.
When all of the relevant factors are considered, it is clear that the 1992 Senate reapportionment plan violates § 2 of the Voting Rights Act. Plaintiffs have presented strong evidence of racially polarized voting, the most important factor. The state's history of official discrimination in voting, and the lingering effects of discrimination upon the educational and economic status of black citizens of west Tennessee, also weigh in favor of a finding of vote dilution. These factors have all contributed to black candidates' lack of electoral success in west Tennessee. The only factor which clearly weighs in favor of the State is the State's interest in preserving the integrity of county lines. Consequently, we find that under the totality of the circumstances the 1992 Senate reapportionment plan violates § 2 of the Voting Rights Act by affording black voters in west Tennessee less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

IV.
Having found a violation we must address the remedy. To begin, we enjoin the State from conducting any more elections under the 1992 redistricting plan contained in *467 Chapter 826 of the Public Acts of 1992. The State is ordered to submit a new plan which complies with the Voting Rights Act. The Supreme Court has "repeatedly held that redistricting and reapportioning legislative bodies is a legislative task, which the federal court should make every effort not to preempt." Wise v. Lipscomb, 437 U.S. 535, 539, 98 S.Ct. 2493, 2496, 57 L.Ed.2d 411 (1978). We also ask plaintiffs to submit alternative plans. We assume that the State will consider the views of the plaintiffs and all other interested parties when drawing a new plan.
The Senate Report indicates that "the remedy fashioned must be commensurate with the right that has been violated ... so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." Senate Report at 31. Although other courts have referred to the Senate Report standard in fashioning a remedy, e.g., Brown, 722 F.Supp. at 400, the standard does not provide much guidance. We reject the contention that a "complete and full" remedy means drawing districts to achieve maximum possible black representation in the legislature. The explicit rejection in the text of the statute of any right to proportional representation indicates that Congress did not intend to require maximum representation. See Burton v. Sheheen, 793 F.Supp. 1329 (D.S.C.1992); Turner v. Arkansas, 784 F.Supp. 553, 557 (E.D.Ark. 1991). The evidence before us indicates that one more majority-black Senate district must be drawn in west Tennessee. A second majority black district would provide slightly more representation than the state's black voting age population require. It would create five black Senate districts in the state or more than 15% of the districts when the black voting age population is 14.4% The issue of creating a fifth black Senate district should be left to the political judgment of the legislature. It is not required by federal law.
The State may not justify a failure to draw an additional majority-black district based upon the State's assertions at trial that an "effective" majority-black district should contain a black voting-age population of at least 65%. The 65% figure is a guideline devised by the Department of Justice to compensate for minority communities' usually lower voting-age population, lower voter registration, and lower voter turnout. The figure represents a baseline of 50% to which 5% is added for each factor listed above. See Ketchum v. Byrne, 740 F.2d 1398, 1415 (7th Cir.1984). New information and changing circumstances justify reexamination of the 65% standard. Neal v. Coleburn, 689 F.Supp. 1426, 1438 (E.D.Va.1988). If the State uses voting-age population instead of general population, there is obviously no need to add 5% for lower average voting-age population. Further, the State's voter turnout figures show that black voter turnout in majority-black districts in west Tennessee is higher than white turnout. These figures alone indicate that a district with a 55% black voting-age population would be an "effective" majority-black district. We agree with the statement in Puerto Rican Legal Defense and Educ. Fund v. Gantt, 796 F.Supp. 681, 694 (E.D.N.Y.1992), that there is "no bright line rule for discerning an appropriate VAP [voting-age population] level within a district that passes Voting Rights Act muster."
The legislature should prepare and submit a new plan by January 25, 1994, the same deadline set in our previous opinion dealing with the House of Representatives filed September 15, 1993, as amended on October 5, 1993. We are confident defendants will be able to meet the deadline we have imposed.
Accordingly, it is so ORDERED.
NOTES
[1] The Act provides

(a) No voting qualification ... shall be imposed ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ... (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973 (emphasis added).
[2] We do not concern ourselves in this case with the Rural West Tennessee African-American Affairs Council's Voting Rights Act challenge to the reapportionment of [the Tennessee House of Representatives] because our decision in Langsdon v. Milsaps, 836 F.Supp. 447 (W.D.Tenn. 1993) declared the House reapportionment bill unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, thereby rendering the House reapportionment issue in this case moot.
[3] The latter plan presented by the plaintiffs was not proved during trial, but was offered by the plaintiffs in their Motion to Supplement the Record With Alternative Rural West Tennessee Senate District. Since defendants had no opportunity to examine the demographer who prepared the plan, we do not know the defendants' position relative to this plan. Moreover, it appears that this plan splits the city of Jackson in Madison County.
[4] These factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
Senate Report at 177, 206-07.
The list is not meant to be exclusive, and there is no requirement that any particular number of factors be established Armour v. Ohio, 775 F.Supp. 1044, 1050 (N.D.Ohio 1991).
[5] Both parties employed "ecological regression analysis" to estimate the actual voting behavior of black and white voters. This statistical technique is standard in the field and has been accepted by numerous courts including the Supreme Court in Gingles, 478 U.S. at 53-61, 106 S.Ct. at 2767-2771. Both parties also examined elections other than those for the state legislature. Because the results in these "exogenous" elections are consistent with the results in the state legislative elections, and because state legislative elections are the most relevant to our inquiry, we rely solely upon the evidence of voting behavior in the state legislative contests. C.f. Brown v. Board of Comm'rs of Chattanooga, 722 F.Supp. 380, 390-91 (E.D.Tenn.1989) (relying on the results of previous city elections as most relevant in a Voting Rights Act challenge to the city electoral system).
[6] Because Tennessee law provides that the Speaker of the Senate shall succeed the Governor, the Speaker of the Senate is referred to as the Lieutenant-Governor even though he has no duties in the State's executive branch.
[7] The Tennessee Supreme Court has recognized that this prohibition must yield to the requirements of § 2 if there is a conflict. State ex rel. Lockert v. Crowell, 631 S.W.2d 702, 708-09 (Tenn.1982); State ex rel. Lockert v. Crowell, 656 S.W.2d 836, 843 (Tenn.1983).
[8] The Court observed:

On the one hand, creating majority-black districts necessarily leaves fewer black voters and therefore diminishes black-voter influence in predominantly white districts. On the other hand, the creation of majority-black districts can enhance the influence of black voters. Placing black voters in a district in which they constitute a sizeable and therefore "safe" majority ensures that they are able to elect their candidates of choice.
___ U.S. at ___, 113 S.Ct. at 1156.